CENTRAL CITY EDUCATION ASSOCIATION, IEA-NEA, Petitioner-Appellant, v. THE ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.*, Respondents-Appellees.

First District (4th Division) No. 1—89—0919

Opinion filed May 24, 1990.

Winston & Strawn, of Chicago, and Sandra Holman, of Springfield (Gregory J. Malovance, Jane Clark Casey, and William G. Miossi, of counsel), for petitioner.

Neil F. Hartigan, Attorney General, of Springfield, and Miller, Tracy, Braun & Wilson, of Monticello (Robert J. Ruiz, Solicitor General, and Ann Plunkett-Sheldon, Assistant Attorney General, both of Chicago, and S. Jeff Funk, of counsel), for respondents.

Cornfield & Feldman, of Chicago (Stephen A. Yokich, of counsel), for *amicus curiae* Illinois Federation of Teachers.

JUSTICE LINN delivered the opinion of the court:

Petitioner-appellant, Central City Education Association, IEA-NEA (Association), seeks administrative review of the March 2, 1989, opinion and order of the Illinois Educational Labor Relations Board (IELRB or Board). In that decision, the Board determined that Central City School District No. 133 (District) did not violate the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat. 1987, ch. 48, par. 1701 *et seq.*) by reducing its work force for economic reasons without first submitting to bargaining with the Association.

On appeal, the Association raises two issues: (1) The Board erred in concluding that the District's decision to lay off four teachers for economic reasons was not a topic of mandatory collective bargaining; and (2) the Board erred in finding that the District satisfied its obligation to bargain with the Association concerning the impact of the decision to lay off employees for economic reasons. The Illinois Federation of Teachers filed an *amicus* brief challenging the Board's use of its so-called "balancing test" for determining what constitutes a mandatory subject of bargaining. Both respondents-appellees, the Board and the District, filed briefs in support of their positions.

For the reasons that follow, we reverse.

BACKGROUND

The parties filed a joint stipulation of the record before the Board, and therefore the facts are not in dispute.

Central City School District No. 133 is a school district for kindergarten through eighth grade. The District employed approximately 18 certified employees for the school year of 1986-87. On January 16, 1987, the District sent a letter to all certified personnel advising that a reduction in force was possible for the upcoming year. Two Association representatives and the superintendent met to discuss that possibility. The superintendent told the Association representatives that program cuts were not likely for the upcoming year and any reductions in force probably would not affect the two representatives. The Association also alleges that the superintendent went further, telling its representatives that there were ways to get around program cuts; that cuts in programs and personnel were not expected; but that if there were any layoffs, it would be only one person.

On March 10, 1987, the District's board of education voted to dismiss one nontenured certified employee and to eliminate three full-time positions occupied by tenured teachers. This action was to become effective at the end of the 1986-87 school year, in June 1987, and the teachers involved were so notified by letter.

The Association is the exclusive representative of the Districts' full-time certified personnel. Prior to March 10, there were no collective bargaining negotiations. By letter dated March 13, 1987, the president of the Association (one of the laid-off, tenured teachers) expressed surprise regarding the District's decision and demanded to bargain the decision to reduce the faculty and its impact on employee wages, hours, terms and conditions of employment.

The District cited its "fragile" financial condition, desire to save money by reducing labor costs, and declining student enrollment. The courses that were taught by the laid-off teachers were offered again during the 1987-88 school year. The laid-off teachers had taught eighth-grade remedial math and language arts, sixth grade, and gym.

On March 27, 1987, the Association filed unfair labor practice charges with the Illinois Educational Labor Relations Board regarding the District's reduction in force of four bargaining unit employees without prior bargaining with the Association. The Association also submitted to the District bargaining proposals regarding the staff reductions.

On April 3, 1987, the District notified the Association that it was

willing to bargain the impact of the reductions in force, and eventually, in connection with the upcoming 1987-88 school year, the parties did bargain over the impact of the previous reduction in force.

The parties submitted briefs and argument before the Board and filed a joint stipulation of record. The Board issued its opinion and order on March 2, 1989, two out of three members holding that the initial decision to reduce force is not a mandatory subject of bargaining. The majority further found that while the impact of such a decision is mandatory subject of bargaining, the District had met its obligations to bargain the impact.

OPINION

I

■ The Board requests us to dismiss the appeal for lack of jurisdiction because the petition for review was filed within 35 days, under the Administrative Review Law (Ill. Rev. Stat. 1987, ch. 110, par. 3—103), rather than within 30 days, under Supreme Court Rule 303(a) (107 Ill. 2d 303(a)). At the time the Association's petition was filed, the 35-day period was accepted, at least implicitly, as the proper limitation period on seeking review of the IELRB's final orders. (See *Board of Education of Plainfield Community Consolidated School District No. 202 v. Illinois Educational Labor Relations Board* (1986), 143 Ill. App. 3d 898, 493 N.E.2d 1130; *Board of Education of Jacksonville, School District No. 117 v. Illinois Educational Labor Relations Board* (1989), 183 Ill. App. 3d 972, 539 N.E.2d 882; *Hardin County Education Association v. Illinois Educational Labor Relations Board* (1988), 174 Ill. App. 3d 168, 528 N.E.2d 737.) In fact, the Board's order in the pending case expressly directs "aggrieved parties" to seek judicial review in the appellate court in accordance with the provisions of the Administrative Review Law, and states that "judicial review must be sought within 35 days of the issuance of this Order."

The Board cites the recent decision of another division of this court, *County of Cook, Cermak Health Services v. Illinois Local Labor Relations Board* (1989), 189 Ill. App. 3d 1057, 545 N.E.2d 934,[1] *appeal allowed* (1990), 131 Ill. 2d 558 (*Cermak*). In that case, the fifth

---

[1]The appellate court's opinion in *Cermak* has been withdrawn from the bound volume at the cited page number in the North East Reports and republished with a supplemental opinion on denial of rehearing, February 16, 1990, at 551 N.E.2d 229. The citation to the Illinois Appellate Reports remains 189 Ill. App. 3d 1057.

division determined that Supreme Court Rule 335(h), by implication, "establishes that Rule 303(a) is suitable for direct review of Local Labor Relations Board orders, and that section 3—103 of the Administrative Review Law is unsuitable for such review." 189 Ill. App. 3d at 1060, 551 N.E.2d at 231-32.

The Association argues that since its petition for review was filed two months before the filing of the opinion in *Cermak*, we should not retroactively apply that court's "sharp change from well-established and consistent law." Moreover, the Association points out that, even after *Cermak*, the Board continued to include in its final orders and opinions language that directs aggrieved parties seeking review in the appellate court to file their petitions within 35 days.

We agree that applying the holding of *Cermak* to this case would be inequitable, especially since the accepted practice (as demonstrated by the Board's own notices) has led litigants to rely on the 35-day period for review. We find the fifth division's analysis to be logical, and we agree that neither the legislature nor an administrative agency can abrogate the supreme court rules governing appeals. Nevertheless, for us to hold that we have no jurisdiction over this appeal would penalize a litigant for complying with the accepted practice and case law in effect at the time it filed its petition for review. Such a result is unfair.

We do not imply that we have power to hear cases over which we lack jurisdiction. If a party attempts to appeal from a nonfinal order we must dismiss it as untimely. Under Supreme Court Rule 304(a), we may review final orders that are not immediately appealable if that order disposes of one branch of ongoing litigation *and* the trial court expressly finds that there is no just cause for delaying enforcement or appeal of that order. In such cases, the limits on appeals protect the court from being asked to render advisory opinions or review cases piecemeal. The appeal in the pending case, however, is from a final and appealable order. There is no threat to the appellate process, unless the legislative enactment of the Illinois Supreme Court as to the time for filing notices of appeal under its rules. While we believe that the *Cermak* rationale for applying the 30-day period of Rule 303(a) may be valid,[2] we do not find that retroactive application serves any useful purpose. On the contrary, it may result in the ambush of un-

---

[2]Compare *Cermak* with the decision of the Fourth District Appellate Court in *American Federation of State, County & Municipal Employees v. Illinois State Labor Relations Board* (1990), 196 Ill. App. 3d 238 (declining to dismiss appeal on rationale of *Cermak*).

wary appellants who had no previous reason to question the 35-day period. Accordingly, we decline to dispose of this appeal on the basis of *Cermak*. See *Elg v. Whittington* (1987), 119 Ill. 2d 344, 357, 518 N.E.2d 1232, 1238 ("[A] new rule or decision will be given prospective operation whenever injustice or hardship due to justifiable reliance on the overruled decisions would thereby be averted").

## II

Under the facts of this case, does the Illinois Educational Labor Relations Act require the District to collectively bargain its decision to reduce force for economic reasons before such decision is implemented? Ill. Rev. Stat. 1987, ch. 48, pars. 1704, 1710(a).

In Illinois, as in other States, educational employers and employees must bargain certain issues, in good faith and to an impasse, as part of the collective bargaining law. Section 10(a) of the Act describes the general duty to bargain:

"(a) An educational employer and the exclusive representative have the authority and the duty to bargain collectively as set forth in this Section. Collective bargaining is the performance of the mutual obligations of the educational employer and the representative of the educational employees to meet at reasonable times and confer in good faith *with respect to wages, hours and other terms and conditions of employment*, and to execute a written contract incorporating any agreement reached by such obligation, provided such obligation does not compel either party to agree to a proposal or require the making of a concession." (Emphasis added.) Ill. Rev. Stat. 1987, ch. 48, par. 1710(a).

Section 4 of the Act, the "employer rights" provision, states in pertinent part:

"Employers shall not be required to bargain over matters of inherent managerial policy, which shall include such areas of discretion or policy as the functions of the employer, standards of services, its overall budget, the organizational structure and selection of new employees and discretion of employees. *Employers, however, shall be required to bargain collectively with regard to policy matters directly affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by employee representatives*." (Emphasis added.) Ill. Rev. Stat. 1987, ch. 48, par. 1704.

According to the Association, section 10(a) is the starting point of the analysis of the duty to bargain, and, in this case, the end. According to the Association, if the subject in issue is wages, hours, or other

terms and conditions of employment, it is a mandatory topic of bargaining under section 10(a), and no further analysis is necessary. Because the economic layoff of teachers directly affects the terms and conditions of employment, the Association argues, the District violated its duty to bargain over the layoffs.

The District, on the other hand, contends that section 10(a) must be read in conjunction with section 4 of the Act, the "employers' rights" provision. That section reserves certain managerial decisions to the employer without the need for bargaining. The IELRB has formulated a three-step analysis for determining which issues must be bargained: If the decision in issue does not involve wages, hours, or terms and conditions of employment, there is no duty to bargain. If it does involve one of those categories under section 10, the analysis proceeds to step two. This step entails finding whether the matter in issue also involves a matter of "inherent managerial policy" under section 4 of the Act. If not, the matter is a subject of mandatory bargaining. If so, the third step is triggered, the balancing test. This test weighs the interests of the employees in bargaining the issue against the District's interest in maintaining unfettered control over the managerial policy involved. If the employees' interests are deemed to prevail, the issue must be bargained. If management's interest is deemed greater, however, it is not a mandatory subject of bargaining and is considered to have only an "indirect" effect on the wages, hours, or terms and conditions of employment.

The Fourth District Appellate Court approved the Board's use of a balancing test in *Decatur Board of Education, District No. 61 v. Illinois Educational Labor Relations Board* (1989), 180 Ill. App. 3d 770, 536 N.E.2d 743.

APPLICABILITY AND FORMULATION OF THE BALANCING TEST

Because of the initial controversy over the propriety of using a balancing test, we first consider the test in terms of statutory construction.

■ Section 10(a) sets out the duty to bargain over employees' wages, hours, and terms and conditions of employment, and section 4 exempts from bargaining those matters that may be characterized as management-related concerns of the educational employer. We find no conflict, in the abstract, between the two sections. The second sentence of section 4, however, reads as a qualifier or limitation on the management-related exemptions to the duty to bargain; it recognizes that even those topics that are managerial concerns yield to the duty to bargain if they "directly affect" the employees' wages, hours and

terms and conditions of employment. The Act does not mention a balancing test. Such a test would not appear to be necessary if the notion of what management policies directly affect wages, hours, and terms and conditions of employment was capable of clear definition and easy understanding. Unfortunately, it is not.

In the pending case, it is undisputed that laying off teachers greatly affects their wages, hours, and terms and conditions of employment. Nor is it disputed that, under section 4, matters relating to overall educational policy, budgeting, and organization are managerial concerns that do not mandate bargaining, at least unless they "directly affect" wages, hours and terms and conditions of employment. The major point of contention, then, is the test to be applied when a particular issue (here, layoffs) but only affects terms and conditions of employment, but also affects important managerial policy. In such instances, the balancing test has been adopted as a reasonable approach to harmonize competing interests, under the rubric of whether the subject in issue directly, or only indirectly, affects the employees' wages, hours, and terms and conditions of employment.

We find that the Labor Board's adoption of such an approach is not unreasonable and therefore should be followed. (See *Hardin County Educational Association v. Illinois Educational Labor Relations Board* (1988), 174 Ill. App. 3d 168, 528 N.E.2d 737.) We do not agree with petitioner's interpretation of the Act. Its theory is that, under section 10(a), once the determination is made that an issue involves an employee term or condition of employment, that issue must be bargained without further consideration of section 4 concerns. Such an interpretation, however, could well complicate the practical determination of whether a particular issue, claimed to be one of managerial prerogative on the one hand and also one involving employees' hours, wages, and terms and conditions of employment on the other, could ever be resolved in a manner consistent with the policies of the Act. As the Fourth District Appellate court has observed:

> "Several factors support the adoption of a balancing test. Governor James Thompson mentioned the need to balance employers' and employees' interests in his Amendatory Veto Message of the Act [citation]. The Pennsylvania Public Employees Relations Act (Pa. Stat. Ann. tit. 43 §1101.201 *et seq.* (Purdon Supp. 1988)), which applies to school districts, served as a guideline in the preparation of the Illinois Act. The courts of Pennsylvania have approved the use of a balancing test. [Citation.] *** A balancing test has also been adopted by the Illinois State Labor Relations Board [citation], which may also be considered as

persuasive authority. See Ill. Rev. Stat. 1987, ch. 48, par. 1717." *Decatur Board of Education, District No. 61 v. Illinois Educational Labor Relations Board* (1989), 180 Ill. App. 3d 770, 774, 536 N.E.2d 743, 745-46.

We conclude that if the topic in issue appears to be both a matter involving terms and conditions of employment and one of management prerogative, use of the balancing test is proper.

■ The real problem is the *application* of the balancing test. In *Decatur*, the court found that the "Board members all agree[d] that a finding of direct effect, under the second sentence of section 4, did not automatically result in mandatory bargaining. The Board adopted a balancing test whereby, after finding a direct effect exists, the interests of the employees are weighed against the School District's interest in maintaining unencumbered control over the managerial policy." 180 Ill. App. 3d at 772, 536 N.E.2d at 745.

The opinion and order of the Board in that case, however, actually stated the test differently. On petition for rehearing, this discrepancy was brought to the court's attention. The following excerpt is taken from the appellate court's supplemental opinion on denial of rehearing and quotes the IELRB's order and opinion as follows:

" '[The Act provides that when a given subject is both a term and condition of employment and a policy matter reserved to management,] those policy matters "directly affecting wages, hours and terms and conditions of employment" must be bargained. In *Berkeley*, we said that "policy matters directly affecting wages, hours and terms and conditions of employment" are those policies that have "wages, hours and terms and conditions of employment as their primary subject ***" [*Berkeley School District No. 87*, 2 Pub. Employee Rep. (Ill.) par. 1066, No. 84—CA—0057—C (Illinois Educational Labor Relations Board, May 30, 1986)]. When a given subject is both a term and condition of employment and a managerial prerogative, the question becomes how to determine if a policy has "wages, hours and terms and conditions of employment as [its] primary subject" under *Berkeley*. We believe that such policies should be identified by using a balancing test.' " 180 Ill. App. 3d at 779, 536 N.E.2d at 749.

In its supplemental opinion, the *Decatur* court then quoted an excerpt from the March 2, 1989, opinion and order rendered by the Board in the pending case (*Central City School District No. 133*), in which the Board commented upon the *Decatur* court's restatement of the balancing test:

" '[In *Decatur*], the Appellate Court stated in passing that the IELRB balances the competing interests "after finding a direct effect exists" (*i.e.*, that a policy decision directly affects wages, hours and terms and conditions of employment). Rather, we balance the competing interests only after determining that a given subject is both "wages, hours, and terms and conditions of employment" and a matter of educational policy. We *then* apply our balancing test to determine if the policy matter "directly affect(s) wages, hours and terms and conditions of employment" within the meaning of the second sentence of Section 4 of the Act. \*\*\*' " (Emphasis added.) 180 Ill. App. 3d at 780, 536 N.E.2d at 749.

The *Decatur* court, while recognizing that "a problem of sematics may be involved" in the differing statements of the balancing test, nevertheless let stand its own interpretation of the Act. The court thereby altered the Board's formulation of its test in a subtle but significant way.

While we wish to tread carefully through the thickets of administrative and judicial interpretations, we agree with the IELRB's formulation of the terms of the Act itself. We also believe the problem goes beyond semantics because it may well tilt the balancing test toward management prerogatives, in contravention of the Act.

The second sentence of section 4 provides, "Employees \*\*\* *shall be required to bargain collectively* with regard to policy matters *directly affecting* wages, hours and terms and conditions of employment *as well as the impact thereon upon request by employee representatives.*" (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 48, par. 1704.) We believe that this sentence is an express limitation on employer rights to refuse bargaining in cases in which managerial policy is implicated, but the matters nevertheless *directly* affect the employee's terms and conditions. Therefore, the balancing of competing interests requires a factual determination of whether the subject in issue has a "direct" or "indirect" affect on the terms and conditions of employment; or, as the Labor Board stated in *Berkeley*, whether the issue has for its "primary subject" employee wages, hours, and terms and conditions of employment.[3]

In the pending case, the School District agreed to bargain

---

[3]The fourth district in *Decatur* cited the problems with a literal or liberal definition of "directly affecting," which, in its opinion, would cover almost every issue. We share that court's concern over the difficulties in formulating guidelines and are aware that our approval of the IELRB's statement of the balancing test gives it two different tests to apply, depending on the geographical location of the school district involved.

over the "impact" of its decision to reduce its force for economic reasons, but refused to bargain the initial decision. The second sentence of section 4, however, does not differentiate between the decision itself and its impact, when mandatory bargaining is required under the "directly affecting" provision of that section. Accordingly, the fact that impact bargaining occurred after the layoff decision was made does not, in our opinion, cure the violation if the initial decision is one subject to mandatory bargaining.

THE BOARD'S APPLICATION OF ITS BALANCING TEST

██ The Board applied its balancing test as follows. First, it found "little doubt that an educational employer's decision to eliminate bargaining unit positions constitutes a 'term and condition of employment.' " The Board cited *Fibreboard Paper Products Corp. v. NLRB* (1964), 379 U.S. 203, 13 L. Ed. 2d 233, 85 S. Ct. 398, which stated that the words "terms and conditions of employment" plainly covered termination of employment. Next, the Board found that "a management decision to RIF (reduction in force) necessarily implicates several of the prerogatives that the Governor and legislature sought to preserve to the employer in Section 4 of the Act. Standards of services, overall budget and sometimes even organizational structure, are fundamental components of any decision to RIF." The Board cited some of the situations in which RIF decisions may be fundamentally related to management's ability to control the budget, set educational services, and restructure its program based on the elimination of positions.

Having found that the RIF decision was both a matter affecting terms and conditions of employment and a matter of inherent managerial policy, the Board attempted to balance "management's need for unencumbered control against the employees' interest in bargaining the subject matter." After acknowledging that the District's decision "significantly" affected the four terminated teachers, the Board went on to hold:

"RIF decisions are inseparable from the District's responsibility and ability to determine its standards of services and overall budget. These responsibilities are close to the core of the educational employer's prerogative to manage the educational system. Requiring collective bargaining over decisions to reduce the number of teachers would impinge heavily on management's right and ability to make such basic educational policy decisions and choices. Consequently, we conclude that management's need to freely determine educational pol-

icy outweighs the interests of employees in bargaining over such decisions. Thus, the effect on teachers' wages, hours and terms and conditions of employment of a decision to RIF, while substantial, is 'indirect.' "

We pause at the notion of a "substantial" effect that is also "indirect." Such logic aside, we are concerned that the above-stated conclusion fails to comport with the specific facts of this case. The only stated reasons for the layoffs were economic ones. Granted, budget planning, educational services, and organizational restructuring are all matters that may be greatly affected by management's ability to reduce its personnel. We do not argue with the Board's recognition, in a proper case, that the balance of fact-based concerns may favor management's RIF without prior bargaining with the Association. For example, the elimination of a course that is not considered important to the educational goals of a District may result in the elimination of a teacher's position, but the balance of factors in such hypothetical could result in the determination that managerial prerogative outweighed employee concerns, resulting in no prior bargaining. See *West Ottawa Education Association v. West Ottawa Public Schools Board of Education* (1983), 126 Mich. App. 306, 337 N.W.2d 533 (no duty to bargain over elimination of a position caused by district's decision to drop its Dutch dance program); *Jacksonville District No. 117*, 4 Pub. Employee Rep. (Ill.) par. 1075 Nos. 85—CA—0025—S, 85—CA—0029—S (Illinois Educational Labor Relations Board, May 17, 1988) (*bona fide* decision to restructure maintenance department held not a topic for mandatory bargaining).

In *Decatur*, the court affirmed the Board's determination that, under its balancing test, a decision to increase class size was a subject for mandatory bargaining. The Board found that increasing class size directly affects the teachers' workload, ability to control and discipline the class, ability to effectively carry out teaching, and amount of work required for a fixed compensation. Certainly, class size also relates to the quality of educational services, but the Board concluded that the employees' interest in bargaining over class size outweighed management's interest in unencumbered control of that matter.

In the pending case, the reason for the layoff was to save money by eliminating salaries. Availability of revenues undoubtedly involves budgeting, affects the District's ability to further its educational goals, and otherwise relates to important managerial prerogatives. However, the four teachers who were laid off suffered the to-

tal termination of all of their wages, hours, and terms and conditions of employment. The remaining teachers were also affected, since the courses taught by the laid-off teachers were not eliminated from the curriculum. As the dissenting Board member noted, the elimination of the positions therefore either increased the class size of the remaining teachers, or else there has been a decline in enrollment that exactly matches the number of pupils that the laid-off teachers would have taught. No such evidence is of record. While we do not imply that such facts are necessarily required, we believe that the Board's finding that the balance favors management prerogative must be based on facts of record, or our review is meaningless.

The Board conceded that "at first blush" its decision is difficult to reconcile with its conclusions in *Decatur*. The Board stated, however, that "there is a basic distinction between decisions to reduce-in-force and decisions regarding class size. Class size is fundamentally a term and condition of employment. Its effect on teacher workload is direct and immediate. In contrast, the decision to RIF is close to the core of management prerogatives and only affects class size, if it does at all, in an indirect way. Therefore, it does not follow that there is any contradiction between our holding in *Decatur* and our holding today."

It is difficult to understand how the economically motivated elimination of four positions in a district with 18 employees is less "fundamentally" a term and condition of employment than increasing class size. It may be that *some* RIF decisions would not "directly affect" the remaining teachers, by increasing their class size or otherwise, as in the case where a position is eliminated because the course is discontinued. Nevertheless, if the balancing test is to have any meaning, it must be applied to the specific facts before the Board, not to assumptions of how the RIF decision is "inherently intertwined" with budget concerns and educational services.

BENEFITS/BURDEN APPROACH TO BALANCING TEST

■ We wholeheartedly agree with the Board and numerous courts and commentators who have noted the difficulties attendant in balancing employees' interests with those of management. (See, e.g., *West Bend Education Association v. Wisconsin Employment Relations Comm'n* (1984), 121 Wis. 2d 1, 9, 357 N.W.2d 534, 538 ("Stating the balancing test, as we have just done, is easier than isolating the applicable competing interests in a specific situation and evaluating them").) We believe, however, that this recognition

only underscores the need for bargaining in those situations which are in fact "amenable" to bargaining; that is, ones in which the benefits to the employees and the bargaining process outweigh the burdens imposed on the employer. The benefits/burden analysis has been cited with approval in several cases, including *First National Maintenance Corp. v. NLRB* (1981), 452 U.S. 666, 679, 69 L. Ed. 2d 318, 331, 101 S. Ct. 2573, 2581. While that decision arose in the private sector, the Illinois State Labor Relations Board has followed the Supreme Court's reasoning in public sector cases also. *State of Illinois, (Department of Central Management Services)*, 1 Pub. Employee Rep. (Ill.) par. 2016 No. S—CA—36 (Illinois State Labor Relations Board, Aug. 29, 1985); see *American Federation of State, County, & Municipal Employees v. Illinois State Labor Relations Board* (1989), 190 Ill. App. 3d 259, 546 N.E.2d 687.

The District's basic decision to save money, by reducing expenditures in the form of teacher salaries or otherwise, is something that the Board legitimately may view as a managerial right and duty. If the implementation of the decision to reduce costs leads to cutting down on classroom supplies, conserving electricity, water, and heat, or reshaping its program to trim or eliminate specific programs, the Board presumably would remain within its section 4 prerogatives, without the need for mandatory bargaining. When the implementation of the cost-savings program *includes* laying off employees, terms and conditions of employment are inarguably affected. At this point, the balancing test can be useful in weighing the benefits of bargaining against the burdens to the employer.

### DIRECT EFFECTS UNDER SECTION 4 IS DETERMINED BY SPECIFIC FACTS

The benefits/burden concept may be viewed as a practical tool in determining whether the management decision to RIF "directly affects" the terms and conditions of employment. If the layoff is part of a reorganization or elimination of services, the burden on the employer to bargain such an issue may outweigh the benefits of bargaining, because of the Association's probable inability to propose alternatives that would aid the District in what is essentially a change in curriculum. To go beyond particular facts, however, endangers the delicate balance of the competing interests of employer and employee. As the dissenting Board member in the pending case pointed out, "There is no evidence that *this decision to RIF* was part of a reorganizational plan. Rather, the decision to lay off in the instant case was motivated solely by economics. Reducing its force

is merely one of many means by which an employer can control its overall budget. It is not more central to the inherent managerial policies of controlling the overall budget and standards of services than is class size ***." (Emphasis added.)[2]

Part of the problem is the reality that economic-based decisions are by nature subject to tensions between management aims and employee needs. In the private sector, turning a profit is of great importance to management. A RIF decision for economic reasons would therefore seem to be one which would not be subject to mandatory bargaining. On the contrary, much decisional law in the private sector favors mandatory bargaining in such cases. *E.g., Lapeer Foundry & Machine, Inc.* (July 20, 1988), 289 N.L.R.B. No. 126; *United Gilsonite Laboratories, Inc.* (November 30, 1988), 291 N.L.R.B. No. 125, 1988-89 NLRB Dec. (CCH), par. 15,260, at 28,604 ("A decision to lay off employees for economic reasons is a mandatory subject of bargaining").

The United States Supreme Court has recognized that not all work force layoffs are subject to mandatory bargaining, however. In *First National Maintenance Corp. v. NLRB* (1981), 452 U.S. 666, 69 L. Ed. 2d 318, 101 S. Ct. 2573, the court balanced management's right to close down part of its operations for economic reasons against the employees' interest in job security and held in favor of management on the issue of mandatory bargaining. In its earlier decision of *Fibreboard Paper Products Corp. v. NLRB* (1964), 379 U.S. 203, 13 L. Ed. 2d 233, 85 S. Ct. 398, however, the Court recognized that if the layoff decision did not alter the company's basic operation, but instead simply replaced the in-house work with a subcontract, the requirement to bargain about the matter would not significantly abridge management's freedom to manage the business. Hence, bargaining over the layoff decision was mandatory in *Fibreboard.*

As part of the distinction between the situations in *First National* and *Fibreboard,* the Supreme Court noted that mandatory bargaining will be necessary if the subject is "amenable" to resolution through the bargaining process. The desire to reduce labor

---

[4]Neither the District nor the Board took the position that the decision to reduce forces was motivated by factors other than economic ones. While the Board's brief on appeal suggests that the RIF decision was "primarily," rather than "solely," based on economics, it does not add any new *facts* in support of the supposition that decisions to reduce forces are so intertwined with matters of budgeting, organization, and educational services that they could never be subjects of mandatory bargaining.

costs by replacing bargaining unit employees with outside contracts would be amenable to bargaining, while the decision to change a company's operations or close down part of its operations entirely would not be. (*First National Maintenance Corp.*, 452 U.S. at 680, 686, 69 L. Ed. 2d at 331, 335, 101 S. Ct. at 2581, 2584. See also *Otis Elevator Co.* (April 6, 1984), 269 N.L.R.B. 891, 893 ("[I]f the decision in fact turns on direct modification of labor costs and not on a change in basic direction or nature of the employer enterprise," then the decision is a mandatory subject of bargaining).

The Illinois Educational Labor Relations Board has expressed doubt that a labor cost analysis is of particular relevance in the public service sector, noting that while labor costs might be one of the factors to balance "it does not serve as a pivot point for the mandatory/permissive distinctions as it does in the private sector." (*Jacksonville District No. 117*, 4 Pub. Employee Rep. (Ill.) par. 1075 Nos. 85—CA—0025—S, 85—CA—0029—S (Illinois Educational Labor Relations Board, May 17, 1988), p. IX-312).) We agree that educational employers' concerns are different from private employers' aims to increase profits. Nevertheless, if the main reason for the layoff is to save money by eliminating teacher salaries (as distinct from other reasons previously mentioned), we believe that mandatory bargaining over that decision may well advance the policies of the Act by allowing the employees' representative to suggest cost-saving alternatives to the layoff. The burden to the District has not been established, beyond mere inconvenience[5] and speculation. Here, the layoff decision was not part of eliminating unneeded courses, nor did it otherwise signal a change in the educational policy or basic services of the school. We conclude that the Board's decision was against the manifest weight of the evidence.

MANDATORY BARGAINING IN THIS CASE IS ANALYTICALLY
CONSISTENT WITH PRIOR BOARD DECISIONS

We do not mean to denigrate the Board's expertise or restrict its role as fact finder in applying the balancing test. As implied earlier, part of the difficulty in the pending case is reconciling the Board's decision in *Decatur* (increased class size must be bargained), with the Board's decision in the case before us (the layoff

---

[5]The District raises the spectre of year-round bargaining, arguing that the historic time for collective bargaining has been from mid- to late spring to the beginning of the new school year. Without addressing the merits of this argument, we find that it is not relevant to whether or not a particular issue is subject to mandatory bargaining under the Act.

of four teachers for economic reasons need not). Prior decisions of the Board suggest that the layoff in the pending case should be put in the mandatory bargaining column.

In *Wilmette School District No. 39*, 4 Pub. Employee Rep. (Ill.) par. 1038 No. 85—CA—0078—C (Illinois Educational Labor Relations Board, Feb. 11, 1988), the Board found that a district decision to decrease lunch hours (to conform with State law requiring 300 minutes of class time per day) required bargaining as affecting employees' hours, despite the district's contention that its decision to increase teacher instructional time and decrease lunch time was a matter of inherent managerial policy. In *Mundelein Elementary School District No. 75*, 4 Pub. Employee Rep. (Ill.) par. 1052 (Illinois Educational Relations Board, Mar. 4, 1988), No. 85—CA—0057—C *order vacated on other grounds, Board of Education of Mundelein Elementary School District No. 75 v. Illinois Educational Labor Relations Board* (1989), 179 Ill. App. 3d 696, 534 N.E.2d 1022, the Board held that although the initial decision to change from a junior high school to a middle school format was not in contention, the resulting unilateral addition of a class period to the teachers' workload was a matter requiring bargaining. The Board noted that the potential change in workload should not be treated only as an "impact" bargaining obligation stemming from the decision to reorganize.

Similarly, the District's decision here, to save money as part of overall budgeting, is not itself the bargainable decision. As the IELRB noted in *Mundelein*, however, the implementation of the decision (resulting in the layoff of four teachers) should not be treated as an impact bargaining obligation alone.

*Wilmette, Mundelein* and *Decatur* all recognized the need for mandatory bargaining of District decisions that directly affect wages, hours, and terms and conditions of employment, although the balancing test was not expressed until *Decatur*. In *Berkeley School District No. 87*, 2 Pub. Employee Rep. (Ill.) par. 1066 (Illinois Educational Labor Relations Board, May 30, 1986), the IELRB held that the district's decision to change the nature of its athletic program did not have wages, hours, or terms and conditions of employment as its primary subject. Therefore, it was not a mandatory subject of bargaining. See also *Jacksonville District No. 117*, 4 Pub. Employee Rep. (Ill.) par. 1075 Nos. 85—CA—0025—S, 85—CA—0029—S (Illinois Educational Labor Relations Board, May 17, 1988) (*bona fide* decision to restructure maintenance department held not mandatorily bargainable).

In each of these cases it appears that the Board was able to distinguish between decisions that squarely affected hours, wages and terms and conditions (decrease in lunch hour, increase in class size, addition of another class period to the workload) and, in the cases of *Berkeley* and *Jacksonville*, decisions that primarily involved restructuring or organizational changes. The first group appears "amenable" to bargaining because employee input has a greater likelihood of resulting in satisfactory solutions than the second situation, where the management decision is to restructure part of its operations. See also *Community Consolidated School District No. 59*, 3 Pub. Employee Rep. (Ill.) par. 1094 No. 56—CA—0012—C (Illinois Educational Labor Relations Board, July 23, 1987) (teacher evaluation plans subject to mandatory bargaining).

OTHER JURISDICTIONS

Cases from other States are of limited help because decisions both in support of and against mandatory bargaining in layoff situations exist. For example, Michigan and Wisconsin find that, under their statutes, public employees have no duty to bargain over the decision to lay off employees for budgetary reasons, although the impact of such decisions must be bargained. (See, *e.g., Schoolcraft College Association of Office Personnel/MESPA v. Schoolcraft Community College* (1986), 156 Mich. App. 754, 401 N.W.2d 915; *City of Brookfield v. Wisconsin Employment Relations Comm'n* (1979), 87 Wis. 2d 819, 275 N.W.2d 723.) Other States find a duty to bargain reduction in force. See *School Committee of Newton v. Labor Relations Comm'n* (1983), 388 Mass. 557, 563, 447 N.E.2d 1201, 1206 (layoffs involve "the very essence of the [employment] relationship, the employment itself, and not a peripheral matter").

As one court recognized, "The case law in this area varies substantially, given different fact situations and different treatment by various courts." (*Local 1277, Metropolitan Council No. 23, American Federation of State, County, & Municipal Employees v. City of Center Line* (1982), 414 Mich. 642, 655, 327 N.W.2d 822, 827.) Generalizations as to what other administrative bodies and courts have done, therefore, are not of particular help. Another State's legislation may differ from ours, and the facts under which a case is decided will certainly affect the conclusion that an issue is or is not one that must be bargained.

For the foregoing reasons, we hold as follows: (1) The Board's use of a balancing test was appropriate in this case; (2) the compet-

ing concerns of management and employees should be balanced after the decision is made that an issue involves both a term and condition of employment and one involving "inherent managerial policy," within the meaning of section 4; (3) the issue is one for mandatory bargaining if it "directly affects" employee wages, hours, or terms and conditions of employment, which conclusion may be based on the recognition that the topic is amenable to bargaining under a benefits/burden analysis; (4) the layoff of four teachers to reduce expenditures in this case is appropriate for mandatory bargaining; and (5) the impact bargaining that followed the layoff decision does not substitute for mandatory bargaining of the decision itself. Therefore, the opinion and order of the Board is reversed.

Reversed.

McMORROW, P.J., and JOHNSON, J., concur.