BOARD OF REGENTS OF REGENCY UNIVERSITIES, Petitioner, v. ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.*, Respondents.

Fourth District   No. 4—90—0275

Opinion filed February 6, 1991.

Richard J. Coffee II, of Sangamon State University, of Springfield, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Robert Ruiz, Solicitor General, and Jerald S. Post, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

Stephen A. Yokich, of Cornfield & Feldman, of Chicago, for respondent University Professionals of Illinois.

JUSTICE SPITZ delivered the opinion of the court:

The petitioner, Board of Regents of Regency Universities (Regents), appeals a decision of the Illinois Educational Labor Relations Board (IELRB) which held that Sangamon State University (SSU) committed two unfair labor practices. (*Board of Regents of Sangamon State University*, 6 Pub. Employee Rep. (Ill.) par. 1049, Nos. 89—CA—0030—S, 89—CA—0035—S (Illinois Educational Labor Relations Board, Mar. 12, 1990).) The bases for this decision were the hearing officer's findings, adopted by the IELRB, that SSU reneged on two oral agreements made during the course of collective bargaining. We affirm.

On February 21, 1989, respondent Sangamon State University/University Professionals of Illinois Local 4100, IFT/AFT, AFL-CIO (UPI or the union), filed an unfair labor practice charge against the Regents. This charge alleged that during the course of negotiations, SSU's chief negotiator, Durward Long, agreed to a union request for "release time" for the union's president and grievance officer. According to the charge, this was to be an "agreement outside the agreement," because Long did not want the Regents to know that he had given the union release time. However, after ratification of the parties' agreement, Long allegedly refused to honor the release time provisions to which the parties had agreed.

In an additional unfair labor practice charge filed February 27, 1989, the union alleged that during negotiations, SSU's chief negotiator agreed to provide salary equity adjustments and agreed that subsequent to contract ratification, the union and SSU would bargain a procedure to distribute the salary equity adjustments. At the time the charge was filed, however, SSU allegedly refused to meet with the union to bargain this procedure.

On the basis of the above charges, the IELRB's Executive Director filed an unfair labor practice complaint against the Regents. At a hearing held on July 20, 1989, the union's first witness was its local chapter president, Ron Ettinger. He testified that salary equity for faculty members had been a part of the union's contract proposals since the beginning of contract negotiations with SSU. Ettinger stated that at an August 25, 1988, meeting between him and Durward Long, who was SSU's president and chief contract negotiator, Long stated that he did not feel that the Regents would be agreeable to salary equity adjustments. Long stated, however, that he would be willing to set up a "side agreement" calling for the distribution of up to $20,000 in salary equity adjustments on January 1, 1989, and to negotiate a process for identifying those in need of salary equity adjust-

ments. According to Ettinger, Long promised to bring a letter setting forth the terms of the agreement concerning salary equity adjustments to a negotiating session set for the next day, August 26. Long did not bring such a letter to the August 26 negotiating session, but agreed to produce it subsequently. Ettinger testified that at the August 26, 1988, negotiating session, the parties' negotiating teams entered into an agreement providing for (1) a $20,000 fund for salary equity adjustments and (2) further negotiations as to the distribution of that sum.

Ettinger stated that after the August 26, 1988, negotiating session, he made several fruitless requests to Long for a letter setting forth the agreement on salary equity adjustments. Finally, on November 11, 1988, Long sent Ettinger a letter which read in part:

> "This is a confirmation of the University Administration's commitment to develop an administrative process and criteria to be utilized for making equity adjustments in salary. As we committed, the Administration will do everything possible to develop by the end of the fiscal year a system by which persons may be considered for salary adjustments for equity purposes. Further, the Administration will consult with the UPI Local representative on the system being considered."

This letter made no mention of the total sum to be expended on salary equity adjustments. Ettinger further testified that on December 11, 1988, he received a letter from Ted Heidloff, who is assistant vice-chancellor for personnel administration with the Regents, which he (Ettinger) interpreted as meaning that the Regents and SSU would not negotiate further with respect to the parties' existing contract and would negotiate only with respect to a successor agreement. On January 26, 1989, Ettinger sent Heidloff a written demand for bargaining as to salary equity adjustments, and in a letter dated February 2, 1989, Heidloff, on behalf of the Regents, refused this request.

Ettinger further testified that at a negotiating session held on September 5, 1988, Durward Long agreed to provide release time for Ettinger and the local union's grievance officer (Pat Langley) while they were engaged in union activity. As with the agreement concerning salary equity adjustments, Long did not want this agreement to be included in the parties' written contract. Rather, Long inquired whether the union would agree to the handling of release time for these two union officials through the noninstructional assignment (NIA) process. (An NIA is an assignment of a faculty member to duties other than teaching. Faculty members who have an NIA teach a reduced number of courses during the semester in

question.) Ettinger stated that at the September 5, 1988, negotiating session, the parties agreed that release time for Ettinger and Langley would be handled through the NIA process and that Long would support this.

Ettinger testified that on November 17, 1988, his request for an NIA for union activities was approved by SSU's vice-president for academic affairs, which is normally the last step in the approval process for NIAs. However, after the beginning of the spring 1989 semester, Ettinger received a phone call from Durward Long in which Long stated that he was withdrawing Ettinger's NIA for union activities.

Also testifying on the union's behalf was its grievance officer, Pat Langley. She stated that she was present at the September 5, 1988, negotiating session and that there was no doubt in her mind that at that session, SSU agreed to grant the union's grievance officer an NIA for the spring semester of 1989. However, her NIA request for that semester was not approved.

The union's final witness was Barbara Hayler, who was a member of the union's bargaining team. She testified that she was present at the August 26, 1988, negotiating session. She stated that during that session, Durward Long indicated that he was unwilling to include provisions concerning salary equity adjustments in the parties' contract, but that he was willing to make commitments regarding that matter in a letter and to develop a process for making salary equity adjustments outside the contract. Hayler summarized her understanding of the parties' agreement concerning salary equity adjustments as follows:

> "President Long committed himself and the University to making available up to $20,000.00 at midyear for the purpose of equity adjustments, and further *** he committed himself to working with the Union during the fall semester to develop a process by which inequities could be determined and the appropriate payments or appropriate equity adjustments in salary could be made."

The Regents' first witness was Carl Long, who is vice-president for business administrative services at SSU. He testified that he participated in contract negotiations with the union, and that at the negotiating sessions which he attended between August 10 and September 5, 1988, SSU did not agree to either release time for union officials or to expenditure of $20,000 for salary equity adjustments. On cross-examination, Carl Long acknowledged that no negotiations regarding the issue of salary equity adjustments took place after

December 7, 1988. He did agree that Durward Long committed himself to sending a letter to the union stating SSU's intention to consult with the union regarding the methodology and process of determining salary equity adjustments, but he did not recall discussion of a specific time frame within which to provide such a letter. Carl Long further testified, on cross-examination, that he was present at all contract negotiation sessions during July and August 1988, but that he was not in the room during all portions of the bargaining sessions. He acknowledged that he was not present at the August 25, 1988, private discussion between Durward Long and Ettinger or at any of the other private meetings between Durward Long and Ettinger during the pertinent time period.

The only other witness to testify on the Regents' behalf was SSU's president, Durward Long. Long stated that between August 15 and September 5, 1988, he did not agree with the union's bargaining team to expend $20,000 for equity adjustments to faculty salaries. On cross-examination, Long stated that prior to the conclusion of the collective-bargaining agreement between SSU and the union, he made a commitment to SSU's faculty senate to develop a process for salary equity adjustments and repeated that commitment to the union's negotiators. He acknowledged telling the union's negotiators that he would put that commitment in writing. During the cross-examination of Long, the following dialogue occurred concerning what Long had done to implement the commitment concerning salary equity which he previously described:

"Q. Now what, if any, steps have you taken as we sit here to develop that system?

A. The Union has rejected this as part of the agreement by bringing the unfair labor practice regarding sums of money committed and they have indicated that this is not their understanding of the agreement.

Q. So you—well, yeah, but you told me just a minute ago that you made a commitment to the Faculty Senate?

A. That's correct.

Q. What have you done with respect to your commitment to the Faculty Senate?

A. We have analyzed the salaries and developed, and are developing a—a plan.

Q. Do you, does anything exist that's public as of now?

A. No.

Q. When did you make that commitment to the Faculty Senate?

A. In the spring of 1987—
Q. So—
A. —'88.
Q. So it's been over two years?
A. No, '88.
Q. So it's been over a year—
A. That's correct."

Long also denied that an agreement was made in September 1988 providing for release time for union officials, although he acknowledged that this was a subject of the negotiations and that he provided an NIA to Ettinger during the fall semester of 1988, in exchange for an agreement to continue collective bargaining. Long further denied telling any member of the union's bargaining team that he wanted to keep any provisions or agreements from the Regents.

In a recommended decision and order filed November 28, 1989 (*Sangamon State University Board of Regents*, 5 Pub. Employee Rep. (Ill.) par. 1177, Nos. 89—CA—0030—S, 89—CA—0035—S (Illinois Educational Labor Relations Board, hearing officer's recommended decision and order, Nov. 28, 1989) (hereinafter 5 Pub. Employee Rep. (Ill.) par. 1177 (hearing officer's recommended decision))), the hearing officer found the union's witnesses were more credible. Based on the evidence presented, the hearing officer found that SSU orally agreed:

"1. To resolve the issue of release time outside the contract and grant the UPI chapter president and grievance officer NIA's during the spring, 1989 semester, and            ⁚

2. To use $20,000 for equity raises in fiscal year 1989[,] to provide UPI with a letter memorializing this 'commitment' and to bargain a process under which these funds would be distributed." (5 Pub. Employee Rep. (Ill.) par. 1177, at IX—428 (hearing officer's recommended decision).)

The hearing officer held, though, that there was no explicit agreement to set aside $20,000 for equity raises in a fund.

The hearing officer concluded that the Regents' conduct violated section 14(a)(5) and, derivatively, section 14(a)(1) of the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat. 1989, ch. 48, pars. 1714(a)(5), (a)(1)). With respect to the release time issue, the hearing officer found that the union had been led to believe (1) the existing terms and conditions of employment allowed release time for the union's president and grievance officer during the spring semester, and (2) it was therefore unnecessary for this matter to be

covered in the parties' contract. The hearing officer held that in later denying the union officials' requests for release time, SSU changed the terms and conditions of employment as the parties understood them, without notice or opportunity to bargain with respect to the change.

The hearing officer further determined that the issue of salary equity adjustments falls within the ambit of wages and is therefore a mandatory subject of bargaining. The hearing officer found SSU breached its duty to bargain as to this matter by not continuing to bargain as to the manner in which salary equity adjustments were to be distributed and by refusing the union's direct demands that bargaining continue as to this subject.

On December 15, 1989, the Regents filed exceptions to the hearing officer's recommended decision and order. In their exceptions, the Regents contended that the hearing officer's decision is contrary to the manifest weight of the evidence. The Regents specifically argued that the hearing officer placed too great an emphasis on the testimony of union president Ron Ettinger, and improperly applied the "missing-witness" rule. In a brief in support of their exceptions filed December 22, 1989, the Regents also asserted the hearing officer improperly relied on notes which union officials testified were made by them during the course of the contract negotiations. The Regents asserted these notes were not supported by any foundation in the record, and that there was no testimony that the notes were discussed by the parties or were routinely maintained. Also, the Regents contended that the hearing officer impermissibly shifted the burden of proof from the union, as charging party, to the Regents.

On March 12, 1990, the IELRB issued an opinion and order affirming the hearing officer's recommended decision and order. (*Board of Regents of Sangamon State University*, 6 Pub. Employee Rep. (Ill.) par. 1049, Nos. 89—CA—0030—S, 89—CA—0035—S (Illinois Educational Labor Relations Board, Mar. 12, 1990).) The IELRB declined to disturb the hearing officer's findings as to the credibility of witnesses and also held that the hearing officer properly applied the "missing-witness" rule.

On April 16, 1990, the Regents filed a petition for review of the IELRB's opinion and order.

■ Before addressing the substantive issues, we must first determine whether this court has jurisdiction to consider this appeal. In the "statement of jurisdiction" section of the IELRB's brief, it is suggested that this court lacks jurisdiction if a 30-day time period

for the filing of petitions for review of IELRB orders applies. In their reply brief, the Regents state that they relied on prior decisions in filing their petition for review more than 30 days after the IELRB's decision. The Regents further assert that in light of a statement in the IELRB's opinion and order that there is a 35-day time limit for filing of petitions for review of IELRB orders in the Fourth District Appellate Court, the IELRB should be estopped from asserting that the Regents' petition for review was not timely filed.

The IELRB filed its opinion and order in this cause on March 12, 1990, and the Regents filed their petition for review 35 days later, on April 16, 1990. In *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board* (1990), 196 Ill. App. 3d 238, 553 N.E.2d 415, *appeal denied* (1990), 133 Ill. 2d 551, 561 N.E.2d 685, this court declined to dismiss a petition for review of an order of the Illinois State Labor Relations Board which was filed 33 days after the order was entered. This court stated, "Surely, prudent counsel will now file for administrative review in the appellate court within the [30-day] time frame set forth in Supreme Court Rule 303(a). We should not prejudice those who did not do so in the past." *Council 31*, 196 Ill. App. 3d at 248, 553 N.E.2d at 421.

When the Regents filed their petition for review in the present case, several decisions (*e.g. Board of Education of Jacksonville, School District No. 117 v. Illinois Educational Labor Relations Board* (1989), 183 Ill. App. 3d 972, 539 N.E.2d 882; *Hardin County Education Association v. Illinois Educational Labor Relations Board* (1988), 174 Ill. App. 3d 168, 528 N.E.2d 737; *City of Benton Police Department v. Human Rights Comm'n* (1986), 147 Ill. App. 3d 7, 497 N.E.2d 876) either implicitly suggested or explicitly held that there is a 35-day time limit for filing petitions for review of administrative agency orders in cases such as this, where the legislation creating a right of review does not specify a time frame for seeking review. At least one other decision, however, held that a 30-day time limit applies. (*County of Cook v. Illinois Local Labor Relations Board* (1989), 189 Ill. App. 3d 1057, 551 N.E.2d 229, *appeal allowed* (1990), 131 Ill. 2d 558.) This court's opinion in *Council 31* was filed on March 28, 1990; the petition for rehearing in that case was denied on May 15, 1990, the IELRB's opinion in this case issued on March 12, 1990, suggesting the Regents had 35 days to file an appeal with this district, and the Regents in fact filed for review on April 16, 1990. Under these circumstances, dismissal of this

appeal because a 30-day time limit for filing a petition for review applied would serve no useful purpose. To the contrary, such a result would penalize counsel for following what was accepted precedent when the petition was filed and would thus be unfair and inequitable. (See *Central City Education Association v. Illinois Educational Labor Relations Board* (1990), 199 Ill. App. 3d 559, 557 N.E.2d 418, appeal allowed (1990), 133 Ill. 2d 553.) Under the facts of this case, we hold that the Regents' petition for review was timely filed and that this court has jurisdiction to consider the issues properly presented for review.

■ On appeal, the Regents argue that the hearing officer's findings of fact and assessments of the witnesses' credibility are against the manifest weight of the evidence and that the "missing-witness" rule was misapplied in this case. The Regents also contend the facts as found by the hearing officer do not establish, as a matter of law, that SSU committed unfair labor practices. However, the latter argument was not included in the Regents' exceptions to the hearing officer's recommended decision and order. The Regents have therefore waived this argument (see *Moore v. Illinois State Labor Relations Board* (1990), 206 Ill. App. 3d 327, 338-39, citing II C. Morris, The Developing Labor Law 1710-11 (2d ed. 1983)), and we need consider only the Regents' arguments relating to (1) the sufficiency of the evidence to support the hearing officer's findings of fact and assessments of the witnesses' credibility, and (2) the hearing officer's application of the "missing-witness" rule.

The Regents argue that the hearing officer's credibility determinations are arbitrary, capricious, and unsupported by the record. In support of this argument, the Regents assert: (1) the hearing officer stated no specific reasons for his credibility findings; (2) the credibility of SSU's witnesses was not impeached by other competent evidence; (3) "[i]t is arbitrary and capricious for the IELRB to use the fact that the parties are in dispute over an issue as a basis for finding one party less credible than the other"; (4) in reaching his conclusions, the hearing officer ignored the testimony of SSU's witnesses and the documentary evidence presented by SSU, and "bootstrapped a finding on credibility by ignoring the evidence"; (5) because the Regents were unable to offer an alternative account of events which they assert never occurred, the hearing officer based his credibility assessments on the inability of the Regents to prove a negative; and (6) it is not reasonable to believe, as the hearing officer allegedly found, that (a) SSU agreed to the union's demand for release time without a *quid pro quo* after steadfastly maintaining a

contrary position for 14 months, and (b) SSU also agreed to salary equity adjustments after granting the union 95% of its initial salary demand.

The IELRB argues that the hearing officer relied on far more than the existence of a dispute between the parties in making his credibility determinations, and asserts that the hearing officer stated an adequate basis for his findings concerning the credibility of the witnesses. The union asserts that in view of (1) the extreme deference which should be accorded to factual findings of administrative agencies, and (2) the evidence which clearly supports the hearing officer's findings, the IELRB's decision should be sustained.

We hold the evidence fully supports the hearing officer's findings of fact and assessments of the witnesses' credibility. This is a classic example of the kind of case in which each side presents a different version of the relevant events, and in which the trier of fact must necessarily determine the credibility of the witnesses based in part on his observations of their demeanor while testifying. In an administrative review proceeding such as this, courts may not reweigh the evidence. Rather, the weight to be given the evidence and the determination of the witnesses' credibility are primarily within the province of the administrative agency. The administrative agency's findings of fact are deemed *prima facie* true and correct, and the sole function of a reviewing court is to determine whether the administrative agency's decision is contrary to the manifest weight of the evidence. Ill. Rev. Stat. 1989, ch. 110, par. 3—110; *Jackson v. Board of Review* (1985), 105 Ill. 2d 501, 475 N.E.2d 879.

In the present case, the hearing officer provided an adequate basis for his conclusion that the union's witnesses were more credible than SSU's. The hearing officer observed that the union introduced into evidence written memoranda which established when its contract proposals were presented, and which corroborated the union's account of events which occurred at the bargaining table. The hearing officer noted that by contrast, SSU offered only unsupported assertions of its witnesses that no oral agreements were reached. This portion of the hearing officer's findings is in turn supported by the documents introduced into evidence at the administrative hearing. The documents which the union presented contain numerous written and dated notations, while SSU's exhibits consist mostly of typewritten copies of various SSU contract proposals which contain almost no handwritten notations.

The hearing officer also found that while the demeanor of the union's witnesses was "forthright and credible," the testimony of SSU's witnesses, particularly, Durward Long, was less credible than that of the union's witnesses. The hearing officer found that the demeanor of Durward Long was "one of condescension towards the union" (5 Pub. Employee Rep. (Ill.) par. 1177, at IX—428 (hearing officer's recommended order)), and concluded Durward Long was primarily concerned with justifying his own actions. A review of the testimony presented at the administrative hearing reveals that the record fully supports the hearing officer's determination that the union's witnesses were more credible than those of SSU. One segment of the testimony which suggests that SSU's witnesses were less than credible is the previously quoted portion of Durward Long's testimony on cross-examination concerning SSU's salary equity commitment and what had been done to effectuate that commitment. In addition to this testimony, our review of the record reveals numerous other statements by SSU's witnesses which would have provided a basis for discounting their testimony. The testimony which impugns the credibility of SSU's version of the relevant events also demonstrates that the hearing officer's assessments of the witnesses' credibility were based on more than simply the fact that the parties were in dispute as to various matters.

Contrary to the Regents' contentions, SSU was not improperly required to prove a negative. Rather, the union presented evidence that certain agreements were made, and SSU denied that this occurred. Once the complainant in a proceeding such as this presents a *prima facie* case that various agreements were made, the opposing party always has, in effect, the burden of proving a negative— that there were no agreements. However, this is not an impermissible burden to place on the opposing party.

There is also no merit in the portion of the Regents' argument based on the assertion that the union provided no *quid pro quo* for the agreements as to salary equity adjustments and release time. The record establishes that the union provided concessions for both of the oral agreements the hearing officer found the parties made. Ron Ettinger testified that the union initially requested release time for approximately eight or nine bargaining team members and then reduced that demand to release time for five bargaining team members. The parties ultimately agreed to release time for only two bargaining team members. Moreover, it can be inferred from Ettinger's testimony that the union reduced its original salary demands in exchange for SSU's agreement to provide a package of

salary increases, including $20,000 for salary equity adjustments to be provided pursuant to a separate side agreement. There is thus sufficient evidence of concessions for SSU's agreements to provide release time for two union officials and salary equity adjustments.

The Regents further contend that in making his findings of fact, the hearing officer misapplied the "missing-witness" rule. Ron Ettinger, the union's president, testified that in early September 1988, he had a conversation with Dr. Michael Ayers, who is SSU's vice-president for academic affairs and contract administrator. Ettinger stated that Ayers "remembered the [salary equity] commitment, [and] said that *** he would do what he could to find out about the equity letter." Ettinger testified on cross-examination that Ayers "acknowledged the equity commitment on several occasions and that [a conversation on October 4, 1988] was one of them." Furthermore, Pat Langley, the union's grievance officer and a member of the union's bargaining team, testified that Ayers "was around" during the September 5, 1988, negotiating session, and the Regents acknowledge in their brief that "Dr. Ayers was present at some points in the negotiations." On the basis of the "missing-witness" rule, the hearing officer drew an inference that Dr. Ayers' testimony would have been unfavorable to SSU.

In arguing that the "missing-witness" rule was misapplied in this case, the Regents point out that the union suggested Dr. Ayers would have testified as to events after the conclusion of the negotiations, while the focus of the union's evidence was the alleged agreements made prior to the conclusion of the contract negotiations. Also, the Regents state that Dr. Ayers did not make any agreements with the union and assert that Ettinger did not state which version of the parties' agreement Ayers "remembered" or "acknowledged." Furthermore, the Regents observe (1) that neither side called as witnesses all members of its bargaining team, and (2) that the Regents called as witnesses Durward Long and Carl Long, who were the SSU representatives most heavily involved in the negotiations here at issue. The Regents assert that SSU had no basis for assuming Dr. Ayers' testimony would be required, and that under the facts of this case, Ayers' testimony would have been cumulative at best. Also, the Regents contend that there are no indications that Ayers was unavailable to the union and that, arguably, a negative inference should be drawn against the union for failing to call Ayers to support Ettinger's testimony.

The IELRB states that there is no question SSU had the power to produce Dr. Ayers, and asserts that SSU offered no reason for

its failure to do so. The IELRB argues that only Dr. Ayers could have rebutted Ettinger's testimony concerning his conversations with Dr. Ayers, and that Dr. Ayers must have had some understanding of the nature of the commitments which were discussed in his conversations with Ettinger. The IELRB asserts that the hearing officer's reliance on the "missing-witness" rule was not a manifest abuse of discretion, and notes that this rule was only one of the bases underlying the hearing officer's credibility determinations.

The "missing-witness" rule is based on the principle that failure of a party to produce evidence favorable to it gives rise to a presumption against that party. (*Tepper v. Campo* (1947), 398 Ill. 496, 76 N.E.2d 490.) The rule does not apply if it appears that the testimony of one not called as a witness would merely have been cumulative. McCormick, Evidence §272 (3d ed. 1984); see also *Hicks v. Hendricks* (1975), 33 Ill. App. 3d 486, 342 N.E.2d 144.

An acknowledgment after the conclusion of collective-bargaining negotiations by a representative of one of the parties that an agreement has been reached concerning a particular matter is obviously a significant factor in determining whether an agreement concerning that matter has been reached. Although SSU may not have been aware of a need to call Dr. Ayers as a witness prior to Ettinger's testimony, Ettinger's statements to the effect Ayers acknowledged the existence of a salary equity agreement should have alerted SSU to the need to call Ayers as a witness. If necessary, SSU should have requested a recess or a continuance of the administrative hearing for this purpose.

Contrary to the Regents' contentions, Dr. Ayers' testimony would not have been cumulative. He is the only person who could have rebutted Ettinger's testimony that he (Ayers) acknowledged the existence of a salary equity agreement. Absent SSU providing any explanation for its failure to call Dr. Ayers as a witness, the hearing officer did not err in inferring that his testimony would have been unfavorable to SSU.

The evidence fully supports the hearing officer's findings of fact, as adopted by the IELRB.

The IELRB's opinion and order is affirmed.

Affirmed.

STEIGMANN and McCULLOUGH, JJ., concur.