(No. 70425.—

(Nos. 70584, 70609 cons.—

CENTRAL CITY EDUCATION ASSOCIATION, IEA/ NEA, Appellee, v. THE ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.* (Central City School District No. 133, Appellant).—THE BOARD OF EDUCATION, LeROY COMMUNITY UNIT SCHOOL DISTRICT No. 2, Appellee, v. THE ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.*, Appellants.

*Opinion filed June 9, 1992.—Rehearing denied October 5, 1992.*

MILLER, C.J., concurring in part and dissenting in part.

S. Jeff Funk and Brian A. Braun, of Miller, Tracy, Braun & Wilson, Ltd., of Monticello, for appellant.

Gregory J. Malovance, Jane Clark Casey and William G. Miossi, of Winston & Strawn, of Chicago, and Sandra Holman, of Springfield, for appellee.

Neil F. Hartigan and Roland W. Burris, Attorneys General, of Springfield (Robert J. Ruiz and Rosalyn B. Kaplan, Solicitors General, of Chicago, of counsel), for the Illinois Educational Labor Relations Board.

Charles P. Rose, of Vedder, Price, Kaufman & Kammholz, of Chicago, and Melinda L. Selbee, of Lombard, for *amicus curiae* Illinois Association of School Boards.

Allen D. Schwartz, Everett E. Nicholas, Jr., Philip H. Gerner III, Timothy A. Bridge and Vernon A. Kowal, of Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., of Chicago, for *amicus curiae* Illinois Community College Trustees Association.

R. Theodore Clark, Jr. (Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, of counsel), for *amici curiae* University of Illinois and Illinois Public Employer Labor Relations Association.

Gilbert Feldman and Stephen A. Yokich, of Cornfield & Feldman, of Chicago, for *amicus curiae* Illinois Federation of Teachers.

Joel A. D'Alba, of Asher, Gittler, Greenfield, Cohen & D'Alba, Ltd., of Chicago, for *amicus curiae* Illinois State Federation of Labor and Congress of Industrial Organizations.

Sherman M. Carmell and Adrianne E. Hampo, of Carmel, Cherone, Widmer, Mathews & Moss, Ltd., of Chicago, for *amicus curiae* Chicago Federation of Labor and Industrial Union Council.

Nos. 70584, 70609.—Appeal from the Appellate Court for the Fourth District; heard in that court on a petition for review of an order of the Illinois Educational Labor Relations Board.

Neil F. Hartigan and Roland W. Burris, Attorneys General, of Springfield (Robert J. Ruiz and Rosalyn B. Kaplan, Solicitors General, of Chicago, of counsel), for appellant Illinois Educational Labor Relations Board.

Christopher T. Hexter, of Schuchat, Cook & Werner, of St. Louis, Missouri, Gregory J. Malovance and William G. Miossi, of Winston & Strawn, of Chicago, and Sandra J. Holman, of Springfield, for appellant LeRoy Education Association.

John T. Taylor and Merry C. Rhoades, of Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., of Decatur, for appellee.

Gilbert Feldman, of Cornfield & Feldman, of Chicago, for *amicus curiae* Illinois Federation of Teachers.

Anthony G. Scariano, Raymond A. Hauser and Jon G. Crawford, of Scariano, Kula, Ellch & Himes, Chtd., of Chicago Heights, for *amicus curiae* Board of Education of School District No. 88, Du Page County.

JUSTICE MORAN delivered the opinion of the court:

In order to avoid confusion among these three consolidated causes, we shall set out the history of cause No. 70425 (*Central City*) and cause Nos. 70584 and 70609 (*LeRoy*) individually.

## CENTRAL CITY

The Central City Education Association (CCEA) filed an unfair labor practice charge with the Illinois Educational Labor Relations Board (IELRB) alleging that Cen-

tral City School District No. 133 (District 133) had "unilaterally reduced in force at least four (4) bargaining unit employees represented by *** [the CCEA] without adequate notice and bargaining in good faith." The executive director of the IELRB issued a complaint and notice of hearing. District 133 timely answered, and the parties filed a joint stipulation of record as well as a motion to remove the cause to the IELRB for decision. The hearing officer then ordered that the cause be removed to the IELRB for decision pursuant to 80 Ill. Adm. Code §1120.40(f) (1991).

Following the submission of briefs and oral argument, the IELRB issued its opinion, finding that a school district's decision to reduce in force (RIF) is not a mandatory subject of bargaining. (*Central City School District 133*, 5 Pub. Employee Rep. (Ill.) par. 1056, No. 87—CA—0018—S (IELRB Mar. 2, 1989).) The IELRB also found that the *impact* of the decision to RIF is a mandatory subject of bargaining, but that District 133 had met its burden regarding that issue. The CCEA then filed a petition for review in the appellate court. (Ill. Rev. Stat. 1989, ch. 48, par. 1716.) The appellate court reversed the decision of the IELRB, holding that a decision to RIF for economic reasons is a mandatory subject of bargaining. (*Central City*, 199 Ill. App. 3d 559.) This court allowed District 133's petition for leave to appeal (134 Ill. 2d R. 315).

## LEROY

The LeRoy Education Association (LEA) filed a complaint with the IELRB alleging that LeRoy Community Unit School District No. 2 (District 2) violated the Illinois Educational Labor Relations Act (Act) by failing to bargain concerning the development and implementation of a teachers' evaluation plan, and concerning the impact of that decision. (Ill. Rev. Stat. 1987, ch. 48, par. 1714.)

The hearing officer found that District 2 had violated the Act. District 2 then filed an exception to that ruling with the IELRB. Following the submission of briefs and oral argument, the IELRB filed an opinion adopting the hearing officer's findings and affirming the hearing officer's determination that District 2 had violated the Act. *LeRoy Community Unit School District 2,* 5 Pub. Employee Rep. (Ill.) par. 1131, No. 88—CA—0031—S (IELRB June 23, 1989).

District 2 thereafter filed a petition for review in the appellate court. That court reversed the IELRB's decision and found that District 2 did not violate the Act by failing to bargain with the LEA over the implementation and impact of a teachers' evaluation program. (*LeRoy,* 199 Ill. App. 3d 347.) This court then granted the LEA's petition for leave to appeal (134 Ill. 2d R. 315), and consolidated the *LeRoy* and *Central City* cases.

## ISSUES

The issues on appeal to this court are: (1) whether the decision to reduce in force in *Central City,* or the development and implementation of the teachers' evaluation plans in *LeRoy,* are mandatory subjects of bargaining under the Act; (2) whether section 16(c) of the Act, as amended (Ill. Rev. Stat. 1989, ch. 48, par. 1716(c)), permitting enforcement actions to be brought by the IELRB in the appellate court, unconstitutionally expands the jurisdiction of that court; and (3) whether timeliness or waiver issues affect determination of appellants' rights.

## FACTS: *CENTRAL CITY*

The parties in *Central City* filed a joint stipulation of record before the IELRB. Thus, the facts are not in dispute.

In January of 1987, District 133 notified its certified employees that it was considering a reduction in force (RIF) for the upcoming school year. On March 10, 1987, District 133's board of education voted to dismiss one nontenured certified employee and to eliminate the positions held by three full-time teachers, effective at the end of the 1986-87 school year. District 133 did not notify the CCEA directly of its decision to RIF, but did inform the teachers by letter. District 133 explained publicly, and privately to the CCEA, that the four teachers were laid off as a cost-saving measure because of District 133's fragile financial condition, as well as for other reasons such as declining enrollment. Prior to the teachers' dismissal, there had been no collective bargaining between District 133 and the CCEA regarding the decision to RIF.

The CCEA president wrote to the school board expressing shock over its unilateral decision to RIF, and demanding to bargain the board's decision. Although there were four fewer teachers the following school year, the classes, courses, and programs that had been taught by the laid-off teachers were offered again and taught by the remaining teachers.

## FACTS: *LeROY*

The facts of the *LeRoy* case were laid out fully in the appellate opinion (*LeRoy*, 199 Ill. App. 3d at 351-56). They may be summarized as follows.

The LEA, which represents the certified personnel in District 2, entered into two successive collective-bargaining agreements with District 2, covering the years 1985 through 1989. The first agreement, which expired on June 30, 1988, contained a provision dealing with employee evaluations. Following the passage of article 24A of the School Code (Ill. Rev. Stat. 1985, ch. 122, par. 24A—1 *et seq.*), which required that school districts, "in

cooperation with" the teachers' bargaining representative, develop an evaluation plan complying with specific requirements set out in section 24A—5 of the School Code (Ill. Rev. Stat. 1985, ch. 122, par. 24A—5), the LEA formed a committee to discuss negotiation of an evaluation plan. On May 29, 1986, the LEA sent a formal request to District 2 to bargain the "decisions and effects" of teacher evaluation plans in response to article 24A. Subsequently, the LEA received District 2's first proposed evaluation plan. LEA members were under the impression that the ensuing discussions between the LEA and District 2 were negotiating sessions. District 2, on the other hand, maintains that it sought only "input," not counterproposals, from the LEA.

In September 1987, District 2 presented its evaluation plan to the LEA. The LEA responded with its own plan, which differed in several essential points from the plan drawn up by District 2. In March 1987, District 2's committee gave the LEA committee a second evaluation proposal, and the two committees set up a joint meeting schedule. As a result, several LEA proposals were accepted by the District 2 committee. However, District 2 insists that the LEA committee operated only in an advisory capacity.

The joint meetings of both committees continued, and on July 27, 1987, District 2 gave the LEA a draft proposal which was essentially the composite proposal to which both committees had previously agreed. However, on September 11, 1987, District 2 sent the LEA a revised plan which included items which had never been discussed by the joint committee, as well as others which had been deleted by the joint committee from earlier projected plans. The LEA sent a letter of protest to the school board. Nevertheless, on September 14, 1987, District 2 formally adopted the September 11, 1987, revised plan.

While meetings of the evaluation committees continued, District 2 and the LEA had begun collective-bargaining discussions concerning the 1987 through 1989 contract. On April 10, 1987, the LEA presented District 2 with a contract proposal which would incorporate, as article V, the plan developed by the evaluation committee. During contract negotiations, District. 2 repeatedly rejected the incorporation of article V. Both District 2's and the LEA's negotiators recognized that the proposed article V failed to comply completely with section 24A–1 of the School Code. However, the LEA negotiator stated that he knew the LEA committee was still working on what it considered to be a proper plan.

In December 1987, the LEA filed unfair labor practice charges with the IELRB, alleging that District 2 had unlawfully adopted and implemented a teacher evaluation plan. Subsequently, the IELRB filed a complaint charging District 2 with violating sections 14(a)(1) and (a)(5) of the Act (Ill. Rev. Stat. 1987, ch. 48, pars. 1714(a)(1), (a)(5)) by unilaterally adopting a teacher evaluation plan.

The IELRB hearing officer determined that District 2 violated the Act by failing to bargain with the LEA concerning the development and implementation of a teacher evaluation plan, and by failing to bargain over the impact of the decision to implement the plan. District 2 then filed exceptions to the hearing officer's recommended decision with the IELRB. Following the submission of briefs and oral argument, the IELRB issued an opinion adopting the hearing officer's findings of fact and affirming the hearing officer's determination that District 2 had violated sections 14(a)(1) and (a)(5) of the Act. The IELRB then ordered that District 2: (1) cease and desist from refusing to bargain with the LEA over the development and implementation of a teacher evaluation plan in conformance with article 24A of the

School Code (Ill. Rev. Stat. 1987, ch. 122, par. 24A—1 *et seq.*) and over the decision to implement the plan; (2) immediately rescind the evaluation plan previously adopted by the school board; (3) make whole those certified employees who received an unfavorable performance rating or other unfavorable personnel action as a direct result of the evaluation plan; and (4) meet and bargain with the LEA over the development of a teacher evaluation plan conforming to the requirements of article 24A of the School Code. *LeRoy Community Unit School District 2,* 5 Pub. Employee Rep. (Ill.) par. 1131, No. 88—CA—0031—S (IELRB June 23, 1989).

District 2 then filed for direct review of the IELRB's order in the appellate court. The IELRB filed a cross-petition for enforcement. The appellate court affirmed the IELRB in part, reversed in part, and remanded the cause to the IELRB. (*LeRoy,* 199 Ill. App. 3d 347.) The court held that: substantive criteria of a teacher evaluation plan are not a subject of mandatory collective bargaining; mechanical procedures involved in the evaluation process and the remediation plan are subject to mandatory bargaining; the LEA's unfair labor practice complaint was timely filed; the LEA had not waived midterm bargaining under the 1985-87 agreement; the "zipper clause" in the 1987-89 agreement did not constitute a "clear and unmistakable" waiver of the right to bargain with respect to the teacher evaluation plan; the LEA had made a viable bargaining demand; and section 16(c) of the Act, as amended to permit the filing of the enforcement actions in the appellate court, was unconstitutional. *LeRoy,* 199 Ill. App. 3d 347.

The LEA and the IELRB filed petitions for leave to appeal (134 Ill. 2d R. 315), raising two issues: whether the substantive criteria of an evaluation plan can be bargained; and whether enforcement actions in the appellate court are constitutional. This court then consolidated

this cause with *Central City*. Various *amici* were permitted to file briefs in both causes, supporting either the school districts' or the teachers associations' points of view.

## ANALYSIS

The first issue to be determined is: What (under the Act) is the appropriate test for the IELRB to use in deciding which issues are mandatory subjects of bargaining? The basic conflict in this area of law arises from two incongruous sections of the Act. Section 10 sets out the duty of the educational employer to bargain, and states in part:

> "An educational employer and the exclusive representative have the authority and the duty to bargain collectively as set forth in this Section. Collective bargaining is the performance of the mutual obligations of the educational employer and the representative of the educational employees to meet at reasonable times and confer in good faith *with respect to wages, hours and other terms and conditions of employment*, and to execute a written contract incorporating any agreement reached by such obligation, provided such obligation does not compel either party to agree to a proposal or require the making of a concession." (Emphasis added.) Ill. Rev. Stat. 1987, ch. 48, par. 1710(a).

Section 4 of the Act, in pertinent part, states:

> "Employers shall not be required to bargain over matters of inherent managerial policy, which shall include such areas of discretion or policy as the functions of the employer, standards of services, its overall budget, the organizational structure and selection of new employees and direction of employees. *Employers, however, shall be required to bargain collectively with regard to policy matters directly affecting wages, hours and terms and conditions of employment as well as the impact thereon* upon request by employee representatives." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 48, par. 1704.)

Thus, in order to determine what issues are subject to mandatory bargaining, it is necessary to reconcile these two sections of the Act.

The appellate court has set out two tests for determining which issues are subjects of mandatory bargaining. (See *Central City*, 199 Ill. App. 3d 559; *LeRoy*, 199 Ill. App. 3d 347.) Both of these tests are essentially balancing tests and have their genesis in an earlier decision of the IELRB. In *Decatur School District No. 61*, 4 Pub. Employee Rep. (Ill.) par. 1076, No. 86—CA—0042—S (IELRB May 17, 1988), the IELRB, recognizing the tension created by sections 4 and 10, devised a test to determine what issues were mandatory subjects of negotiation. The issue in *Decatur* was whether class size was subject to mandatory bargaining. In finding that class size was a mandatory issue of bargaining, the IELRB stated:

"When a given subject is both a term and condition of employment and a managerial prerogative, the question becomes how to determine if a policy has 'wages, hours and terms and conditions of employment as [its] primary subject' ***. We believe that such policies should be identified by using a balancing test. The Governor's amendatory veto suggests such a 'weighing of competing employer and employee interests.' Thus, when faced with this issue, we must strike a balance between the educational employer's need and right to establish and implement educational policy and the interests of the educational employees, expressed by their exclusive representative, when such decisions affect employees wages, hours and terms and conditions of employment." *Decatur School District No. 61*, 4 Pub. Employee Rep. (Ill.), at IX—322.

Thus, the IELRB created a three-part balancing test that is best stated as follows. First, the IELRB must determine whether the matter concerns wages, hours and terms and conditions of employment. If the answer is

no, the inquiry ends, as there is no mandatory duty to bargain. If the answer is yes, then the inquiry proceeds to the second question: Is the matter also one of "inherent managerial policy," within the meaning of section 4? If the answer to the second question is no, the inquiry ends—the matter is a mandatory subject of bargaining.

It is the present situation—where the matter concerns both wages, hours and terms and conditions of employment, *and* an inherent managerial policy—which triggers the third step, an analysis of the second sentence of section 4. The IELRB suggested that a balancing test be used to determine which interests are greater.

"It is generally recognized that courts will give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute." (*Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n* (1983), 95 Ill. 2d 142, 152.) The appellate court has followed this principle and applied the test formulated by the IELRB in *Decatur*. However, because of varying factual scenarios, the appellate court has developed differing interpretations of the third step of the test.

In the appeal of *Decatur* itself, the Fourth District of the appellate court adopted the IELRB balancing test. In so doing, the court stated:

"Several factors support the adoption of a balancing test. Governor James Thompson mentioned the need to balance employers' and employees' interests in his Amendatory Veto Message of the Act (IV House Journal, 84th Ill. Gen. Assem., Sept. 23, 1983, at 9134 (1983 Sess.)). The Pennsylvania Public Employee Relations Act (Pa. Stat. Ann. tit. 43, §1101.201 *et seq.* (Purdon Supp. 1988)), which applies to school districts, served as a guideline in the preparation of the Illinois Act. The courts of Pennsylvania have approved the use of a balanc-

ing test. (*Pennsylvania Labor Relations Board v. State College Area School District* (1975), 461 Pa. 494, 337 A.2d 262.) \*\*\*

We agree with the Board and find that the balancing test is necessary to give proper interpretation to the statutory provisions. \*\*\* The balancing test measures the interests of both sides and is a reasonable method in resolving the overlap problem between sections 10(a) and 4." *Decatur Board of Education, District No. 61 v. Illinois Educational Labor Relations Board* (1989), 180 Ill. App. 3d 770, 774.

It should also be noted that the *Decatur* court stated that the IELRB adopted a balancing test such that "after finding a direct effect exists, the interests of the employees are weighed against the School District's interest in maintaining unencumbered control over the managerial policy." (*Decatur Board of Education, District No. 61*, 180 Ill. App. 3d at 772.) The Decatur Education Association filed a petition for rehearing, arguing that the appellate court's determination of the IELRB's balancing test was improper. The court responded: "We recognize a problem of semantics may be involved. However, our interpretation of legislative intention is final unless changed by our supreme court." *Decatur Board of Education, District No. 61*, 180 Ill. App. 3d at 780.

The Fourth District reexamined the issue in *LeRoy*. Recognizing that a test was necessary to determine which issues were subjects of mandatory bargaining, the court stated its test as follows:

"First, the agency determines the factual question of whether the challenged action involves a policy decision which has a direct or indirect impact on wages, hours, or terms and conditions of employment. If the management policy has a direct effect on the work force, the agency must balance the interests of management with the interests of the work force. Its determination of whose interests are more at risk is a question of law." (*LeRoy*, 199 Ill. App. 3d at 360.)

Thus, as an analysis of the *Decatur* and *LeRoy* cases makes clear, the Fourth District will apply a balancing test only after a determination has been made that the issue has a direct effect on the work force. See also *Board of Regents of Regency Universities v. Illinois Educational Labor Relations Board* (1990), 202 Ill. App. 3d 559.

Shortly before the Fourth District's decision in *LeRoy*, the First District decided the *Central City* case (*Central City*, 199 Ill. App. 3d 559). The *Central City* court rejected the analysis of the Fourth District in *Decatur* because of its feeling that the *Decatur* court had altered the IELRB balancing test. The *Central City* court believed the IELRB test to be the most appropriate test in light of the terms of the Act. Furthermore, the First District, unlike the Fourth District, believed that "the problem goes beyond semantics because it may well tilt the balancing test toward management prerogatives, in contravention of the Act." (*Central City*, 199 Ill. App. 3d at 568.) The court then adopted the balancing test as the IELRB had originally stated it. (*Central City*, 199 Ill. App. 3d at 571.) The court also held that the articulation of the competing interests to be balanced is a "benefits/burden analysis." (*Central City*, 199 Ill. App. 3d at 572.) The court stated that the "benefits/burden analysis" best effectuates the intent of the Act, because the test identifies "those situations which are in fact 'amenable' to bargaining; that is, ones in which the benefits to the employees and the bargaining process outweigh the burdens imposed on the employer." *Central City*, 199 Ill. App. 3d at 572.

The determination of what issues are mandatory subjects of bargaining under the Act is a matter of first impression in this court. As such, it is necessary to fully review the Act, which revolutionized Illinois school labor

law. (*Board of Education of Community School District No. 1 v. Compton* (1988), 123 Ill. 2d 216, 219.) The Act was adopted in 1983, and the legislature had the benefit of the experience and history of similar statutes in other States and in the private sector. Notably, the legislature used the Pennsylvania experience as a model in creating the Act, and the Pennsylvania courts' interpretation of the statute is relevant to any analysis of the Act. *Decatur Board of Education, District No. 61*, 180 Ill. App. 3d at 774.

The Pennsylvania Public Employe Relations Act (Pa. Stat. Ann. tit. 43, §1101.201 *et seq.* (1991)) is a comprehensive labor relations law covering public sector employees. Like the Illinois Act, the Pennsylvania law contains a "management's rights" section exempting certain subjects from collective bargaining. The section states:

> "Public employers shall not be required to bargain over matters of inherent managerial policy, which shall include but shall not be limited to such areas of discretion or policy as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel. *Public employers, however, shall be required to meet and discuss on policy matters affecting wages, hours and terms and conditions of employment* as well as the impact thereon upon request by public employe representatives." (Emphasis added.) Pa. Stat. Ann. tit. 43, §1101.702 (1991).

The Pennsylvania statute differs from the Illinois statute in a very important way. The Pennsylvania statute requires that an employer *meet and discuss* matters affecting wages, hours and terms and conditions of employment, while in Illinois the employer must *bargain* over decisions that directly affect wages, hours and terms and conditions of employment. (Compare Pa. Stat. Ann. tit. 43, §1101.702 (1991), with Ill. Rev. Stat. 1987,

ch. 48, par. 1704.) However, as in Illinois, the courts in Pennsylvania have had to reconcile the tension that is created when the management rights section is read in conjunction with the general bargaining section of the statute (Pa. Stat. Ann. tit. 43, §1101.701 (1991)). To deal with this problem, the Pennsylvania Supreme Court adopted a balancing test. *Pennsylvania Labor Relations Board v. State College Area School District* (1975), 461 Pa. 494, 337 A.2d 262.

The Pennsylvania Supreme Court noted that a balancing test provides the fairest resolution of this problem (noting its adoption in *National Education Association of Shawnee Mission, Inc. v. Board of Education of Shawnee Mission Unified School District No. 512* (1973), 212 Kan. 741, 512 P.2d 426 (interpreting a similar statute and creating a "direct effects" test)), although "in many instances the line [between what is and is not a mandatory subject of bargaining] will be difficult to draw." (*Pennsylvania Labor Relations Board*, 461 Pa. at 507, 337 A.2d at 268.) The court further stated:

> "[W]here an item of dispute is a matter of fundamental concern to the employes' interest in wages, hours and other terms and conditions of employment, it is not removed as a matter subject to good faith bargaining under section 701 [of the Pennsylvania Act] simply because it may touch upon basic policy. It is the duty of the [Labor Relations] Board *** and the courts *** to determine whether the impact of the issue on the interest of the employe in wages, hours and terms and conditions of employment outweighs its probable effect on the basic policy of the system as a whole." *Pennsylvania Labor Relations Board*, 461 Pa. at 507, 337 A.2d at 268.

In addition to Pennsylvania, other States (interpreting their own statutes which are all slightly different) have also held that the use of a balancing test is the most workable model of analysis to accommodate the interests of both management and the employees in the

public sector context. (See, *e.g.*, *City of Miami v. F.O.P., Miami Lodge 20* (Fla. App. 1989), 571 So. 2d 1309; *Local 346 v. Labor Relations Comm'n* (1984), 391 Mass. 429, 462 N.E.2d 96; *Bay City Education Association v. Bay City Public Schools* (1988), 430 Mich. 370, 422 N.W.2d 504; *City of Beloit v. Wisconsin Employment Relations Comm'n* (1976), 73 Wis. 2d 43, 242 N.W.2d 231.) It is important to note that precedents from our sister States are of limited value in this case because each State's public employment relations statute is different from the Illinois law, although they all have a common purpose. Thus, the analysis of the law of our sister States is relevant solely as an aid to this court in interpreting both the legislative intent and the public policy surrounding the Illinois law. However, the management rights section of the Pennsylvania labor statute is particularly relevant because it is so similar to section 4 of the Act. The only relevant distinguishing feature is that the Pennsylvania statute requires an employer to "meet and confer" with the employees' representative, whereas the Act requires "bargaining."

In addition to the public sector labor relations law that has developed in our sister States, it is also useful to analyze labor relations law in the private sector, as this is a well-developed field of law that helped to influence the legislature when it enacted the Act. Private sector labor relations is governed by the National Labor Relations Act (NLRA). Like the Act, the NLRA has a provision requiring that employers bargain with employees concerning wages, hours and terms and conditions of employment. (29 U.S.C. §158(d) (1988).) However, unlike the Act, there is no "management rights" provision in the NLRA. It should additionally be noted that there are some fundamental differences between public and private employers. As the Supreme Court noted:

"A public employer, unlike his private counterpart, is not guided by the profit motive and constrained by the normal operation of the market. Municipal services are typically not priced, and where they are they tend to be regarded as in some sense 'essential' and therefore are often price-inelastic. Although a public employer, like a private one, will wish to keep costs down, he lacks an important discipline against agreeing to increases in labor costs that in a market system would require price increases. A public-sector union is correspondingly less concerned that high prices due to costly wage demands will decrease output and hence employment.

The government officials making decisions as the public 'employer' are less likely to act as a cohesive unit than are managers in private industry, in part because different levels of public authority—department managers, budgetary officials, and legislative bodies—are involved, and in part because each official may respond to a distinctive political constituency. And the ease of negotiating a final agreement with the union may be severely limited by statutory restrictions, by the need for the approval of a higher executive authority or a legislative body, or by the commitment of budgetary decisions of critical importance to others.

Finally, decisionmaking by a public employer is above all a political process. The officials who represent the public employer are ultimately responsible to the electorate, which for this purpose can be viewed as comprising three overlapping classes of voters—taxpayers, users of particular government services, and government employees. Through exercise of their political influence as part of the electorate, the employees have the opportunity to affect the decisions of government representatives who sit on the other side of the bargaining table. Whether these representatives accede to a union's demands will depend upon a blend of political ingredients, including community sentiment about unionism generally and the involved union in particular, the degree of taxpayer resistance, and the views of voters as to the importance of the service involved and the relation between the de-

mands and the quality of service." *Abood v. Detroit Board of Education* (1977), 431 U.S. 209, 227-29, 52 L. Ed. 2d 261, 279-80, 97 S. Ct. 1782, 1795-96.

Having stated the weaknesses of analyzing private sector labor relations, it is also important to note that an analysis of those matters which are subject to mandatory bargaining in private sector labor relations law can be quite useful in an analysis of the Act. The Act was enacted many years after the NLRA and was, to some extent, modeled on the NLRA. Thus, an analysis of the NLRA is useful in determining the legislative intent of the Act. Additionally, the public policy behind both statutes is similar—industrial peace through collective bargaining—making any analysis of private sector law useful as it helps to examine overall labor policy.

In creating a test to determine which issues are mandatory subjects of bargaining under the NLRA, the Supreme Court has applied a benefits/burdens analysis, which is similar to the one adopted by the appellate court in *Central City*. (See *Fibreboard Paper Products Corp. v. NLRB* (1964), 379 U.S. 203, 13 L. Ed. 2d 233, 85 S. Ct. 398; *First National Maintenance Corp. v. NLRB* (1981), 452 U.S. 666, 69 L. Ed. 2d 318, 101 S. Ct. 2573.) The Court, in *Fibreboard*, held that an employer's economically motivated decision to replace its maintenance employees with those of an independent contractor was a mandatory subject of bargaining. In so doing, the Court created the benefits/burdens test, and additionally pointed out the importance of examining bargaining practices in the relevant industry. The Court stated:

> "While not determinative, it is appropriate to look to industrial bargaining practices in appraising the propriety of including a particular subject within the scope of mandatory bargaining. [Citation.] Industrial experience is not only reflective of the interests of labor and management

in the subject matter but is also indicative of the amenability of such subjects to the collective bargaining process." *Fibreboard Paper Products Corp.*, 379 U.S. at 211, 13 L. Ed. 2d at 239, 85 S. Ct. at 403.

As Justice Stewart's concurrence makes clear, the benefits/burdens test does not mean that all issues are mandatory subjects of bargaining. Justice Stewart stated that the case was decided on its facts and that:

> "there are other areas where decisions by management may quite clearly imperil job security, or indeed terminate employment entirely. An enterprise may decide to invest in labor-saving machinery. Another may resolve to liquidate its assets and go out of business. Nothing the Court holds today should be understood as imposing a duty to bargain collectively regarding such managerial decisions, which lie at the core of entrepreneurial control. Decisions concerning the commitment of investment capital and the basic scope of the enterprise are not in themselves primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment. If, as I think clear, the purpose of §8(d) is to describe a limited area subject to the duty of collective bargaining, those management decisions which are fundamental to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from that area." *Fibreboard Paper Products Corp.*, 379 U.S. at 223, 13 L. Ed. 2d at 246, 85 S. Ct. at 409-10 (Stewart, J., concurring).

See also *First National Maintenance Corp.*, 452 U.S. 666, 69 L. Ed. 2d 318, 101 S. Ct. 2573 (holding an economic decision to shut down part of a business is not subject to mandatory bargaining); *Otis Elevator Co.* (1984), 269 NLRB 891 (holding employer's decision to transfer and consolidate certain bargaining unit work is not a mandatory bargaining subject).

The parties and various *amici* argue that the decisions of courts in other States, that have specifically analyzed the questions of whether teacher evaluations and

RIF decisions are subject to mandatory bargaining, are quite persuasive. While these cases can be quite relevant to the issues of prevailing industry norms and public policy, they are nonetheless of little help in determining exactly which issues are mandatory subjects of bargaining under Illinois law. As earlier noted, the Act was enacted in 1983 as part of comprehensive public labor relations legislation. It is also notable that Illinois was one of the last major industrial States to enact such legislation, and thus the legislature had the benefit of reviewing the public sector experiences of other States, as well as those in the private sector.

Section 4 of the Act is virtually identical to the management rights section of the Illinois Public Labor Relations Act (Ill. Rev. Stat. 1987, ch. 48, par. 1604), and thus an analysis of the legislative history of both acts is appropriate. For that reason, it is instructive to examine the debates in the legislature surrounding the management rights provision. On June 30, 1983, the following colloquy occurred in the Illinois Senate:

"SENATOR COLLINS:

Yes, thank you, Mr. President and members of the Senate. Senate Bill 536, I'm sure as you know, creates the Illinois Public Labor Relations Act. The bill has gone to the House and has been amended, and I feel that the final product of this bill is designed to protect the rights of both public employers and employees and it provides for orderly procedures for implementation and the administration of the Act. This bill is the product of about six months of concentrated effort of various segments of labor, public employees, public employers, mayors, attorneys, Chicago, industry ... commerce and industry and many lawyers across this State. And I personally feel that it is a workable product and that we should concur. The House amended this bill ***. It added back the management right sections that we had previously had in the drafting of the bill ***

\*\*\*

SENATOR KEATS:

\*\*\* So, if you don't mind, I'm just going to ask three questions, and the sponsor has been kind enough to ... give some thought to these answers. Does the management rights clause now included in Section 4 of Senate Bill 536 set forth those matters not subject to bargaining under this Act with the intention of preserving as management rights all areas of discretion or policy affecting the functions of the employer?

\*\*\*

SENATOR COLLINS:

Yes. Amendatory binding Statute [sic] is not extended to any of the areas of employment subject to management discretion or policy making ... matters affecting hours or wages in condition of employment." 83d Ill. Gen. Assem., Senate Proceedings, June 30, 1983, at 96-98.

Later, on November 2, 1983, the following colloquy took place between Representative Karpiel and Representative Greiman, one of the sponsors of House Bill 1530 (which became the Act):

"KARPIEL:

Representative, could you answer ... Is there a Section in this Bill on management rights?

\* \* \*

GREIMAN:

Absolutely. Absolutely.

KARPIEL:

Could you tell me what they include?

GREIMAN:

Sure. \*\*\* Section IV is two paragraphs, and it precisely sets out the rights of the management.

KARPIEL:

I don't have the Bill in front of me, Representative. Could you tell me what some of those are?

\* \* \*

GREIMAN:

\*\*\* I will give you a synopsis of it. 'Employers shall not be required to bargain over matters of inherent managerial policy'. And then it suggests a number of items which are discretionary as to that policy and deal with the function of the employers and the standards of service. It is quite clear. \*\*\*

\*\*\*

GREIMAN:

\*\*\* The management rights are quite clear. They are explicit. They are based on a history of the National Labor Relations Act. They are based on a history of Labor relations in this state, and they are some 25 lines in this Bill. And they are quite clear as to what the rights of management, and they are quite awesome." (83d Ill. Gen. Assem., House Proceedings, Nov. 2, 1983, at 196-97.)

Finally, it is useful to look at a statement made by Senator Bruce, responding to a general question on the scope of bargaining from Senator Buzbee:

"Senator Buzbee, we do have a long history in the State of Illinois, and historically, the scope of bargaining has been very broad and this bill will not change that. In fact, within Section 4 of the Act, it states that 'employers shall be required to bargain collectively with regard to any matter concerning wages, hours or conditions of employment about which they have bargained for and agreed to in a collective bargaining agreement prior to the effective date of the Act.' In addition to that, the preceding paragraph puts that language in that they shall, in fact, if they have not already bargained, bargain over wages, hours, terms and conditions of employment as well as the impact thereon upon request by employee representatives. So, in fact, it will give the bargaining rights over wages, hours, terms and conditions, other things mentioned in the bill would include already, class size, textbook ... selection, evaluation procedures and like ... like things presently in collective bargaining agreements and presently being bargained." (83d Ill. Gen. Assem., Senate Proceedings, Nov. 2, 1983, at 64.)

As Senator Bruce's comments show, the legislature was trying to affirm its commitment to management rights, while at the same time not limiting the traditional bargaining subjects, as stated in section 10.

Although it is clear that the legislature is committed to protecting managerial authority, it is not easy to establish the limits of such authority. As was brought out in oral argument, virtually every decision in collective bargaining could be characterized as either inherently managerial or as concerning wages, hours and terms and conditions of employment. As has been documented throughout this opinion, legislatures, courts, and labor boards have expended considerable time and effort in trying to find a workable compromise between these two, competing goals. Determination of whether specific issues are mandatorily bargainable or not is best left to the IELRB, which has the knowledge and experience to balance the equities in a given case. However, our legislature has placed guidelines in the Act as to what should, and should not be bargained. Section 4 states that, even if a subject is inherently managerial, "[e]mployers *** shall be required to bargain collectively with regard to policy matters directly affecting wages, hours and terms and conditions of employment." Ill. Rev. Stat. 1987, ch. 48, par. 1704.

As we stated earlier in this opinion, the appellate court and the IELRB have developed various tests to determine which subjects should be bargained under section 4, and which subjects should not. (See *Central City*, 199 Ill. App. 3d 559; *LeRoy*, 199 Ill. App. 3d 347; *Decatur Board of Education, District No. 61*, 180 Ill. App. 3d at 772; *Decatur School District No. 61*, 4 Pub. Employee Rep. (Ill.) par. 1076, No. 86–CA–042–S (IELRB May 17, 1988); *Berkeley School District No. 87*, 2 Pub. Employee Rep. (Ill.) par. 1066, No. 84–CA–

0057—C (IELRB May 30, 1986).) After a thorough review of the legislative history, case law, and the experiences in our sister States and in the private sector, this court finds that the manifest intent of sections 4 and 10 can best be met by utilizing a three-part balancing test as a method for analyzing whether or not a given issue is a mandatory subject of bargaining.

The first part of the test requires a determination of whether the matter is one of wages, hours and terms and conditions of employment. This is a question that the IELRB is uniquely qualified to answer, given its experience and understanding of bargaining in education labor relations. If the answer to this question is no, the inquiry ends and the employer is under no duty to bargain.

If the answer to the first question is yes, then the second question is asked: Is the matter also one of inherent managerial authority? If the answer to the second question is no, then the analysis stops and the matter is a mandatory subject of bargaining. If the answer is yes, then the hybrid situation discussed in section 4 exists: the matter is within the inherent managerial authority of the employer and it also affects wages, hours and terms and conditions of employment.

At this point in the analysis, the IELRB should balance the benefits that bargaining will have on the decisionmaking process with the burdens that bargaining imposes on the employer's authority. Which issues are mandatory, and which are not, will be very fact-specific questions, which the IELRB is eminently qualified to resolve.

District 133 argues that a balancing test such as this raises the specter of year-round bargaining, which would be a practical nightmare for school boards. This concern is valid, but it does not affect the essential nature of the test that the IELRB should apply. When the IELRB bal-

ances the benefits and the burdens in a given case, the practicality of the situation is an important factor for it to consider. However, it should be noted that meaningful negotiations do not necessarily have to be long and drawn out. The circumstances surrounding a specific case, including the timing, are part of the subjective criteria examined in determining if bargaining has been in good faith, as well as what type of bargaining is required in a given situation. See, *e.g., Service Employees International Local Union No. 316 v. Illinois Educational Labor Relations Board* (1987), 153 Ill. App. 3d 744; *Cherokee Culvert Co.* (1983), 266 NLRB 290; *School Committee v. Labor Relations Comm'n* (1983), 388 Mass. 557, 447 N.E.2d 1201; *Commonwealth v. Pennsylvania Labor Relations Board* (1988), 120 Pa. Commw. 356, 549 A.2d 240.

In the instant cases, the IELRB did not use the three-part test just stated in analyzing the issue of mandatory-bargaining subjects. Thus the causes must be remanded. The IELRB may additionally wish to make a more detailed inquiry into the bargaining practices and experiences concerning teacher evaluation plans and RIF decisions in other school districts in order to determine whether these issues are amenable to fruitful bargaining. Because the application of the test requires a detailed factual analysis that the IELRB is particularly well suited to examine, we remand these causes to the IELRB for further proceedings consistent with this decision.

Issues have been raised in these causes which are likely to reappear on remand, and in the interest of judicial economy the court will examine them now. The next issue raised on appeal is whether section 16(c) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1716(c)) is unconstitutional. This section provides for enforcement actions to be brought by the IELRB in the appellate court of a ju-

dicial district where the IELRB maintains an office (*i.e.*, either the first or fourth district). Pursuant to this section, the IELRB filed a claim as cross-appellant in the *LeRoy* cause for enforcement in the appellate court. The appellate court held that "[s]ince enforcement-compliance procedures brought pursuant to [section 16(c)] necessarily involve the exercise of original jurisdiction by [the appellate court]," the section is unconstitutional. *LeRoy*, 199 Ill. App. 3d at 371.

Section 16 provides that petitions for enforcement may be brought directly in the appellate court rather than in the circuit court. The relevant section states:

"(b) Whenever it appears that any person has violated a final order of the Board issued under this Act, the [Illinois Educational Labor Relations] Board may commence an action in the name of the people of the State of Illinois by petition, alleging the violation, attaching a copy of the order of the Board, and praying for the issuance of an order directing the person, his officers, agents, servants, successors, and assigns to comply with the order of the Board. Upon the commencement of the action, the Court may grant or refuse, in whole or in part, the relief sought, provided that the Court may stay an order of the Board in accordance with Section 3—111 of the Code of Civil Procedure pending disposition of the proceedings. The Court may punish a violation of its order as in civil contempt.

(c) The proceedings provided in subsection (b) of this Section shall be commenced in the Appellate Court of a judicial district in which the Board maintains an office." Ill. Rev. Stat. 1989, ch. 48, par. 1716.

The appellate court found that section 16(c) would require it to exercise original jurisdiction over enforcement actions in violation of article VI, section 6, of the Illinois Constitution of 1970. (*LeRoy*, 199 Ill. App. 3d at 369.) Section 6 states:

"Appeals from final judgments of a Circuit Court are a matter of right to the Appellate Court in the Judicial District in which the Circuit Court is located except in cases appealable directly to the Supreme Court and except that after a trial on the merits in a criminal case, there shall be no appeal from a judgment of acquittal. The Supreme Court may provide by rule for appeals to the Appellate Court from other than final judgments of the Circuit Courts. The Appellate Court may exercise original jurisdiction when necessary to the complete determination of any case on review. The Appellate Court shall have such powers of direct review of administrative action as provided by law." Ill. Const. 1970, art. VI, §6.

The IELRB argues that its cross-petition for enforcement under section 16(c): (1) only asks the appellate court to enforce an order brought before it for review, and thus is not an "original action"; and (2) invokes judicial powers ancillary to the appellate court's function as a court of judicial review and inherent in its authority as an Illinois court. Thus, the IELRB essentially argues that it is not asking the appellate court to exercise original jurisdiction in contravention of the Illinois Constitution. Furthermore, the IELRB argues that an enforcement order is the logical conclusion of an action for judicial review of an administrative decision and an integral part of the appellate court's direct review of administrative actions. 134 Ill. 2d R. 335.

In support of its argument, the IELRB makes reference to the Federal system, which allows actions for direct review and/or enforcement of National Labor Relations Board orders in the Federal courts of appeals. (See 29 U.S.C. §160(e) (1988); *NLRB v. Ohmite Manufacturing Co.* (7th Cir. 1977), 557 F.2d 577.) However, the jurisdiction of the Federal courts of appeals is not the same as that of the Illinois appellate court when reviewing administrative proceedings. As was earlier stated, the Illinois appellate court has only such power of direct

review as the legislature may provide. (Ill. Const. 1970, art. VI, §6.) The judicial article of the United States Constitution (U.S. Const., art. III) provides that the Federal judicial power is "vested in one supreme Court, and in such inferior Courts as the Congress may from time to time establish." Thus, unlike the situation under the Illinois Constitution, Congress can give Federal courts of appeals original jurisdiction.

The IELRB further argues that the supreme court rules fully contemplated appellate court proceedings to enforce agency actions. Supreme Court Rule 335(h)(1) states:

> "Insofar as appropriate, the provisions of Rules 301 through 373 (except for Rules 321 through 326) are applicable to proceedings under this rule. As used in any applicable rule, the term 'appellant' includes a petitioner and the term 'appellee' includes a respondent in proceedings to review or enforce agency orders." 134 Ill. 2d R. 335(h)(1).

The IELRB notes that under the section for appellate review in the Environmental Protection Act (Ill. Rev. Stat. 1989, ch. 111½, par. 1041) the appellate courts are allowed to entertain enforcement proceedings. However, it is significant to note that under the Environmental Protection Act (unlike under the Illinois Educational Labor Relations Act), the Environmental Protection Agency may institute proceedings for enforcement before the Pollution Control Board. (Ill. Rev. Stat. 1989, ch. 111½, par. 1030 et seq.) There is a complex procedural process that can be used to file enforcement proceedings before the Pollution Control Board, prior to the appeal to the appellate court. (Ill. Rev. Stat. 1989, ch. 111½, par. 1042.) Supreme Court Rule 335 expressly contemplates review in situations such as the enforcement of Pollution Control Board proceedings, and not in-

dependent actions for enforcement under the Act. See 134 Ill. 2d R. 335, Committee Comments, at 293.

This court has repeatedly asserted the strong presumption that legislative enactments are constitutional. (See, *e.g.*, *Bernier v. Burris* (1986), 113 Ill. 2d 219, 227.) Courts have a duty to sustain legislation whenever possible and to resolve all doubts in favor of constitutional validity. *Agran v. Checker Taxi Co.* (1952), 412 Ill. 145, 148.

The legislature has provided that the Board may petition the appellate court to issue an order directing compliance with an order of the Board. (Ill. Rev. Stat. 1989, ch. 48, par. 1716.) The Illinois Constitution states that the appellate court may exercise original jurisdiction when necessary to the complete determination of any cause on review, and that the court "shall have such powers of direct review of administrative action as provided by law." (Ill. Const. 1970, art. VI, §6.) Further, Supreme Court Rule 366(a)(5) states:

> "(a) In all appeals the reviewing court may, in its discretion, and on such terms as it deems just,
>
> * * *
>
> (5) enter any judgment and make any order that ought to have been given or made ***." (134 Ill. 2d R. 366(a)(5).)

Courts have the inherent power to enforce their orders by way of contempt. *In re G.B.* (1981), 88 Ill. 2d 36, 41.

A court will ordinarily examine the constitutionality of a statute only to the extent required by the case before it, and will not formulate a rule broader than necessary for application to the particular situation in question. (*People v. Rogers* (1989), 133 Ill. 2d 1, 8.) Thus, we decline to determine whether the statute might be unconstitutional in its application to other cases. We find, however, that, under the facts of *LeRoy*, where the Board has cross-appealed for enforcement of its order in

a cause already under review by the appellate court, the court may issue such an order without violating the constitution.

Finally, a number of issues are raised concerning timeliness or waiver that could affect an appellant's rights. In the *LeRoy* case, District 2 contends: that teacher evaluation plans were bargained during successor negotiations and thus waived; that the issue of teacher evaluation plans was waived via a "zipper clause" in the collective-bargaining agreement; and that the unfair labor practice charges were not timely filed.

District 2 contends that the collective-bargaining agreement it signed with the LEA contained a provision on teacher evaluation plans, and thus the subject was waived. District 2 is correct in that when a mandatory subject of bargaining has been fully bargained by the parties, and they have reached an agreement which is incorporated into the collective-bargaining agreement, further negotiations over the subject may be waived. (See *East Richland Education Association v. Illinois Educational Labor Relations Board* (1988), 173 Ill. App. 3d 878.) However, a continuing obligation to bargain will exist for items that are not fully set forth in the agreement.

In this case, both the LEA negotiator and the District 2 negotiator stated that they knew that the provision concerning teacher evaluations in the collective-bargaining agreement failed to comply with section 24A—1 of the School Code. Furthermore, both sides to the collective-bargaining agreement knew that simultaneous meetings were being held between District 2 and the LEA concerning evaluation plans. Thus, it is clear that the finding of the IELRB, that the parties had not fully bargained teacher evaluation plans, is supported by the manifest weight of the evidence. The LEA did not waive the issue by signing the collective-bargaining agreement.

District 2 next contends that the "zipper clause" in the collective-bargaining agreement amounted to a contractual waiver of bargaining over the teacher evaluation plan. Article X, section 10.1, of the 1987-89 collective-bargaining agreement stated:

> "The terms and conditions set forth in this agreement represent the full and complete understanding between the Board of Education of LeRoy Unit District No. 2 and the LeRoy Education Association. Alterations, changes, additions, deletions or modifications to this agreement may occur only with mutual consent of both parties. The association agrees that all negotiable items have been discussed during the bargaining leading to this agreement and agrees that negotiations will not be reopened on the effect of any item contained in this agreement during the life of this agreement."

The IELRB found that the "zipper clause," here at issue, did not preclude further bargaining over teacher evaluation plans. The IELRB noted that, despite the language of article V of the agreement which discussed evaluation plans, the bargaining history of these specific parties shows that there was no intent to waive the issue. District 2 argues that article V of the agreement clearly shows that the LEA knowingly and intelligently waived further bargaining over teacher evaluation plans.

A waiver in a collective-bargaining agreement must be established by clear and express contractual language. (*American Federation of State, County & Municipal Employees v. Illinois State Labor Relations Board* (1989), 190 Ill. App. 3d 259, 269; *East Richland Education Association*, 173 Ill. App. 3d at 896.) A determination of the effect of a "zipper clause" may be made by reference to the express contractual language, or by examination of extrinsic evidence to show that the parties did not use the contractual words in their ordinary

meaning. *East Richland Education Association*, 173 Ill. App. 3d at 887-88.

The IELRB found that the bargaining history of the parties overcame District 2's allegations that the "zipper clause" constituted a clear and unmistakable waiver of the right to bargain teacher evaluation plans. In this case, the negotiators were aware that negotiations over teacher evaluation plans were occurring simultaneously with those over the collective-bargaining agreement. Furthermore, both sides to the negotiations stated that they felt that the provision regarding teacher evaluations in the collective-bargaining agreement was not in compliance with the School Code. The extrinsic evidence shows that the parties could not have intended to allow the "zipper clause" to preclude bargaining over a subject which would violate the law if not resolved. District 2 has not made any arguments that warrant this court's reversing the IELRB's decision on the issue.

District 2 finally argues that the LEA's unfair labor practice charge was not timely filed under section 15 of the Act. In pertinent part, section 15 of the Act states that "[n]o order shall be issued upon an unfair practice occurring more than 6 months before the filing of the charge alleging the unfair labor practice." (Ill. Rev. Stat. 1989, ch. 48, par. 1715.) *Wapella Education Association v. Illinois Educational Labor Relations Board* (1988), 177 Ill. App. 3d 153, states that the limitations period begins to run when a party knew or should have known that an unfair labor practice has been committed.

The LEA filed its first unfair labor practice charge on December 17, 1987. A couple of weeks later, the LEA withdrew the charges because the attorney for District 2 told a representative of the LEA that further negotiation meetings, in settlement of the dispute, would take place. Based on this information, the LEA wrote to the IELRB on January 19, 1988, requesting that the charges

be withdrawn. The next day, District 2's attorney advised the LEA that District 2 would not meet with it to discuss the evaluation plans. The same charges were then refiled by the LEA on January 28, 1988. Because the LEA withdrew its charges based upon the representations of District 2's agent that the dispute could be settled, District 2 is estopped from claiming that the charges were untimely filed. See *Witherell v. Weimer* (1987), 118 Ill. 2d 321, 330.

The IELRB found that the LEA had notice on September 14, 1987, when District 2 unilaterally changed its policy regarding teacher evaluation plans. District 2 argues that the latest date that the LEA knew or should have known of its unilateral action was on July 14, 1987, when, during an evaluation committee meeting, one of the District 2 negotiators stated, "[W]e're done, we're finished, we're done." An in-depth examination of which party is correct as to the final date is irrelevant to the resolution of the issue. Assuming that the LEA first had notice on July 14, 1987, its unfair labor practice charge was still timely filed on December 17, 1987, five months and three days after it initially had notice. Therefore, the IELRB properly had jurisdiction over this dispute under section 15 of the Act. Ill. Rev. Stat. 1989, ch. 48, par. 1715.

Finally, one issue remains in the *Central City* case. District 133 contends that the appellate court lacked jurisdiction and should have dismissed the CCEA's petition for review because the petition was not filed within 30 days after the IELRB delivered its opinion and order, as required by Supreme Court Rule 303(a) (134 Ill. 2d R. 303(a)). When the CCEA's petition was filed, the 35-day period set out in the Administrative Review Law (Ill. Rev. Stat. 1987, ch. 110, par. 3—103) was generally accepted as the proper limitation period when seeking review of the IELRB's final orders. (See, *e.g., Board of*

*Education of Jacksonville, School District No. 117 v. Illinois Educational Labor Relations Board* (1989), 183 Ill. App. 3d 972.) However, District 133 argues that the petition was not timely filed under *County of Cook v. Illinois Local Labor Relations Board* (1989), 189 Ill. App. 3d 1057, where the court held it lacked jurisdiction to consider a petition for review filed 32 days after a decision of the Illinois Local Labor Relations Board.

This court has recently reviewed the *County of Cook* case and has held that a party appealing from a judgment of the Illinois Labor Relations Board must file a notice of appeal within 30 days after the entry of judgment. (*County of Cook v. Illinois State Local Labor Relations Board* (1991), 144 Ill. 2d 326.) The court pointed out in *County of Cook* that, although the legislature could have explicitly stated in the Illinois Public Labor Relations Act a time within which direct review of administrative orders must be commenced, it did not do so. This court will not imply an appeal period which the legislature has not expressly imposed. Thus, the limitations period for appeal from the Illinois Labor Relations Board should be that set out in Supreme Court Rule 303(a). Similarly, the legislature failed to state an appeal period in the Act. Therefore, we hold that the period for filing of appeals from the IELRB shall also be 30 days. However, we cannot penalize the petitioner for untimely filing of his petition when the law governing the applicable appeal period was not settled. Because, as this court noted in *County of Cook*, it would be unfair to extend our ruling retroactively, we hold our ruling on this issue to be prospective in nature from the filing of this opinion.

For the reasons stated, the judgment of the appellate court in No. 70425 (*Central City*) is affirmed. The judgment of the appellate court in Nos. 70584, 70609 cons. (*LeRoy*) is reversed, and the decision of the IELRB is

set aside. The causes are remanded to the IELRB for further proceedings consistent with this opinion.

*No. 70425—Affirmed;*
*cause remanded.*
*Nos. 70584 & 70609—Appellate court*
*judgment reversed;*
*IELRB decision set aside;*
*cause remanded.*

CHIEF JUSTICE MILLER, concurring in part and dissenting in part:

Unlike the majority, I do not believe that the Illinois Educational Labor Relations Board failed, in either of these consolidated actions, to apply an appropriate test for determining the scope of the parties' duty to bargain. Accordingly, the present matters do not need to be remanded to the Labor Board for further consideration, and I would reach the merits of these cases at this time.

The Illinois Educational Labor Relations Act (Ill. Rev. Stat. 1989, ch. 48, pars. 1701 through 1721) provides a comprehensive framework for collective bargaining at all levels of public education. Toward that end, the Act imposes on educational employers and employees a number of duties in the negotiation of collective-bargaining agreements. (See *Board of Education of Community School District No. 1 v. Compton* (1988), 123 Ill. 2d 216, 219-21.) Section 10(a) of the Act requires that employers bargain with employees over "wages, hours and other terms and conditions of employment." (Ill. Rev. Stat. 1989, ch. 48, par. 1710(a).) The bargaining requirement imposed by section 10(a), however, must be read in conjunction with the employer rights provision of the Act. Section 4 provides, in pertinent part:

"Employers shall not be required to bargain over matters of inherent managerial policy, which shall include such areas of discretion or policy as the functions of the

employer, standards of services, its overall budget, the organizational structure and selection of new employees and direction of employees. Employers, however, shall be required to bargain collectively with regard to policy matters directly affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by employee representatives." (Ill. Rev. Stat. 1989, ch. 48, par. 1704.)

As section 4 states, policy matters directly affecting employee wages, hours, or other terms or conditions of employment are mandatory subjects of bargaining under the Act. The boundary line between policy matters that must be submitted to bargaining and policy matters that may remain managerial prerogatives is not drawn with perfect clarity, however.

In determining in the present cases whether the policy matters at issue were mandatory subjects of bargaining, the Labor Board applied the balancing test it had previously formulated in its earlier opinion in *Decatur School District No. 61*, 4 Pub. Employee Rep. (Ill.) par. 1076, No. 86—CA—0042—S (IELRB May 17, 1988), *aff'd sub nom. Decatur Board of Education, District No. 61 v. Illinois Educational Labor Relations Board* (1989), 180 Ill. App. 3d 770. The majority purports to adopt a somewhat different standard and thus remands the matters to the Board for further proceedings. The court does not make clear, however, in what respect its test differs from the Labor Board's.

The majority considers at length case law from other jurisdictions, as well as the legislative history of the Act and its companion law, the Illinois Public Labor Relations Act (Ill. Rev. Stat. 1989, ch. 48, pars. 1601 through 1627), ground the Labor Board has already covered in earlier decisions (see, *e.g., Berkeley School District No. 87*, 2 Pub. Employee Rep. (Ill.) par. 1066, No. 84—CA—0057—C (IELRB May 30, 1986)). Notwithstanding its de-

tailed review of these authorities, the majority offers only the following explanation of its test:

> "At this point in the analysis, the IELRB should balance the benefits that bargaining will have on the decisionmaking process with the burdens that bargaining imposes on the employer's authority. Which issues are mandatory, and which are not, will be very fact-specific questions, which the IELRB is eminently qualified to resolve." 149 Ill. 2d at 523.

I fail to see any meaningful distinction between the balancing test proposed by the majority and the balancing test already being used by the Labor Board. To the extent that the two tests differ, the Labor Board's formulation provides a more comprehensive description of the relevant criteria. I would note too that courts generally defer to an agency's interpretation of ambiguous statutory language it is charged with administering. See *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* (1984), 467 U.S. 837, 842-45, 81 L. Ed. 2d 694, 702-04, 104 S. Ct. 2778, 2781-83; *Airey v. Department of Revenue* (1987), 116 Ill. 2d 528, 536.

The majority's formulation simply calls for a weighing of the burdens and benefits of bargaining, without specifying what they might be. The Labor Board, however, has provided greater detail about the matters it considers when it determines whether a matter of managerial policy must be submitted to bargaining. In *Central City*, the Labor Board explained:

> " 'To determine the answer to this third and final step of the analysis, we devised a test which balances the educational employer's "need and right to establish and implement educational policy" and the interests of the employees, expressed by their exclusive representative. If the interests of the employer are greater, there is no obligation to bargain. If, however, the interests of the employees are greater, then the subject *directly affects* wages, hours and terms and conditions of employment, and the

employer must bargain.' [Citation.]'" (Emphasis in original.) *Central City*, 5 Pub. Employee Rep. (Ill.) par. 1056, at IX—120.

I do not believe that the use of the burdens/benefits test now mandated by the majority will materially alter the analysis previously undertaken by the Labor Board in its resolution of this question. The burdens of bargaining would relate to the impact that bargaining the particular issue would have on the employer's interest in maintaining its exclusive control over the matter. Conversely, the benefits of bargaining would relate to the employees' interest in subjecting those policy matters to the give-and-take of the collective-bargaining process.

In the present cases, the Labor Board examined these same considerations in determining whether the matters at issue were mandatory subjects of bargaining under sections 4 and 10(a) of the Act. Discussing the application of its own balancing test, the Board in *Central City* stated:

> "Having determined that the decision to [make a reduction in force] is both a term and condition of employment, as well as a managerial prerogative, we must now balance the competing interests at stake to determine whether it is a 'policy matter directly affecting wages, hours and terms and conditions of employment' within the meaning of the second sentence of Section 4. In so doing, we must balance the employees' interest in bargaining that decision against management's need to 'maintain unencumbered control over managerial policy.' *Decatur Board of Education, District 61*, \*\*\*." (*Central City*, 5 Pub. Employee Rep. (Ill.) par. 1056, at IX—121.)

The Labor Board went on to consider these aspects, and concluded that the school district's decision to reduce its personnel was not a mandatory subject of bargaining.

The Labor Board's analysis in *LeRoy* was less detailed, but there the Board was simply following two earlier decisions in which it had already determined that

teacher evaluation plans are mandatory subjects of bargaining. One of the cases preceded the Board's adoption of the *Decatur* balancing test. The second decision was issued after *Decatur*, however, and there the Board explicitly stated that the same result would obtain through application of a balancing test. See *Mattoon Community Unit School District No. 2*, 5 Pub. Employee Rep. (Ill.) par. 1199, No. 87—CA—0014—S (IELRB Nov. 14, 1988), at IX—542.

In sum, I believe that the Labor Board has already been examining the criteria the majority now mandates, and that remanding these cases to the Board for further proceedings is thus unnecessary. Significantly, the Board itself does not believe that denominating the balancing test a "burdens/benefits" analysis will work any material change in its own treatment of these issues. Like the majority opinion, the appellate court in *Central City* also phrased the balancing test in terms of burdens and benefits. Significantly, the Labor Board has expressly approved the language used by the First District in *Central City* as an accurate description of its test. Discussing the First District and Fourth District opinions in these cases, the Labor Board, in its brief filed with this court in *LeRoy*, states:

> "The *Central City* court has accurately stated the IELRB's balancing test, while the Fourth District opinions in *Decatur* and in [*LeRoy*] do not. ***
>
> *** In the cases at bar, this Court is urged to adopt the Board's balancing test, as described in *Central City*, as a means of evaluating actions that may implicate both employees' rights and employers' prerogatives under the IELRB."

Thus, the Labor Board itself has endorsed the burdens/benefits formulation without discerning in that phraseology a material change in the analysis it will be required to undertake.

As a final matter, I note that the nomenclature adopted by the majority to describe its balancing test is derived from case law concerning private sector bargaining. (See *First National Maintenance Corp. v. NLRB* (1981), 452 U.S. 666, 677-79, 69 L. Ed. 2d 318, 330-31, 101 S. Ct. 2573, 2580-81.) I do not interpret the majority's use of those terms, however, as signifying an intention to find in private sector labor law an answer to every public sector problem. Many differences exist between private sector and public sector collective bargaining, and not every concept used in private labor law is readily transferred to the arena of public sector bargaining. (See *Abood v. Detroit Board of Education* (1977), 431 U.S. 209, 227-28, 52 L. Ed. 2d 261, 279-80, 97 S. Ct. 1782, 1795-96.) As this court has recognized, public bodies and private corporations are subject to vastly different systems of management, funding, and control, and many aspects of public sector labor relations will not find an exact analogue in the private world. (See *Orenic v. Illinois State Labor Relations Board* (1989), 127 Ill. 2d 453, 478-79.) Elected officials are not in all respects like senior management, and taxpayers are not in all respects like stockholders.

Because the Labor Board in these cases examined the relevant criteria now endorsed by the majority, I see no reason to remand the matters to the Board for further proceedings. To the extent that the majority's test actually deviates from the Labor Board's, however, I would adhere to the Board's own formulation. We have before us the Labor Board's considered views regarding these issues, and I would therefore reach the merits of these decisions. Although I disagree with the majority's discussion of the principal question, I join the remaining portions of the court's opinion.